RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0300p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

JOHN DOES 8–10,

> *Plaintiffs-Appellants,*

*v.*

RICK SNYDER; HEIDI E. WASHINGTON; DANIEL H. HEYNS; THOMAS FINCO; DENNIS STRAUB; RANDY TREACHER; MARY BERGHUIS; DAVID BERGH; JEFFREY WOODS; CARMEN DENISE PALMER; THOMAS WINN; DUNCAN MACLAREN; MITCH PERRY; KENNETH T. MCKEE,

> *Defendants-Appellees.*

No. 18-1352

———————————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:17-cv-11181—Robert H. Cleland, District Judge.

Argued:  December 6, 2018

Decided and Filed:  December 18, 2019

Before:  MOORE, GIBBONS, and COOK, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:**  Deborah A. LaBelle, Ann Arbor, Michigan, for Appellants.  Heather S. Meingast, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees. **ON BRIEF:**  Deborah A. LaBelle, Ann Arbor, Michigan, Michael L. Pitt, Cary S. McGehee, PITT MCGEHEE PALMER RIVERS & GOLDEN PC, Royal Oak, Michigan, for Appellants. Heather S. Meingast, Mark E. Donnelly, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees.

—————————

**OPINION**

—————————

KAREN NELSON MOORE, Circuit Judge. The Prison Litigation Reform Act ("PLRA") requires inmates to exhaust available administrative remedies. *See* 42 U.S.C. § 1997e(a). The Supreme Court has explained that "the PLRA contains its own, textual exception to mandatory exhaustion. Under § 1997e(a), the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). The question here is whether the administrative remedies provided to inmates by the State of Michigan are "available." In the case before us, they are not. As the experiences of John Doe 8 and John Doe 10 show, the Michigan Department of Corrections ("MDOC") administrative process is, in practice, filled with contradictions—so much so that we hold that it is unavailable.

John Doe 9's situation is slightly different. Doe 9 did not file a grievance, but he claims that he should be excused from doing so because he experienced retaliation after a prior attempt to submit a grievance. Doe 9's allegations, if true, would deter a person of ordinary firmness from continuing with the grievance process. The district court failed to address this issue on the merits, but it should have.

Accordingly, we **REVERSE** the judgment of the district court and **REMAND** this case for further proceedings consistent with this opinion.

## I. BACKGROUND

The Plaintiffs, John Does 8–10, are inmates in various Michigan prison facilities. At one time, the Does were juveniles housed with adult inmates, a policy that Michigan has since abandoned. The Plaintiffs bring § 1983 claims that stem from alleged sexual abuse by adult inmates, which occurred when the policy of housing juveniles with adults was in place. This is a putative class action, and the class seeks monetary, injunctive, and declaratory relief. (The district court, however, has not yet addressed class certification.) The Defendants are

former-Governor Rick Snyder and a host of other state officials and prison wardens. Before turning to the experiences of each John Doe, some procedural and legal background is helpful.

## A. Prior Litigation

Does 8–10 are making a second appearance in federal court. In a previous case, a separate set of plaintiffs filed a motion to amend their complaint to add Does 8–10, which the district court granted on March 11, 2016. The district court later dismissed these Does on the ground that they failed to exhaust administrative remedies. *See Does 1–12 v. Mich. Dep't of Corr.*, No. 13-14356, 2017 WL 993184 (E.D. Mich. Mar. 14, 2017). At that time, Does 8–10 had not filed any grievances. *Id.* at *4–5. Further, the district court noted that Doe 9 cited no record evidence to support the argument that Doe 9 should be excused from the exhaustion requirement because of potential retaliation. *Id.* at *5. The district court dismissed Does 8–10 without prejudice. *Id.* at *7; *see also Snider v. Melindez*, 199 F.3d 108, 111–12 (2nd Cir. 1999) ("Failure to exhaust administrative remedies is often a temporary, curable, procedural flaw. . . . [A] prisoner who brings suit without having exhausted [his] remedies can cure the defect simply by exhausting them and then reinstituting his suit (in the event the administrative claim fails to afford him the desired relief).").

## B. The Prison Rape Elimination Act & MDOC's PREA Grievance Process

On April 27, 2016, MDOC adopted a grievance process pursuant to the Prison Rape Elimination Act ("PREA"). Approximately one month later, Doe 8 and 10 filed grievances, which MDOC channeled through the PREA process. *See infra* Section I.C. Notably, these events occurred after Does 8–10 were added to the prior litigation but before the district court dismissed them from that case—but neither PREA issues nor Doe 8's and Doe 10's grievances were before the district court during that prior litigation. This case is the first instance in which these points will be addressed.

### 1. PREA

Congress enacted PREA with the purpose of implementing standards and policies to prevent prison rape and to "protect the Eighth Amendment rights of Federal, State, and local

prisoners." 34 U.S.C. § 30302 (formerly 42 U.S.C. § 15602). Congress found that juvenile "offenders are at increased risk of sexual victimization" and "are 5 times more likely to be sexually assaulted in adult rather than juvenile facilities—often within the first 48 hours of incarceration." *Id.* at § 30301(4); *see also id.* at § 30301(6) ("Prison rape often goes unreported, and inmate victims often receive inadequate treatment for the severe physical and psychological effects of sexual assault—if they receive treatment at all.").

PREA generally left intact the PLRA's exhaustion requirement, 42 U.S.C. § 1997e(a), but regulations promulgated pursuant to PREA modified one aspect of exhaustion. On June 20, 2012, the Department of Justice issued a final rule mandating that an "agency shall not impose a time limit on when an inmate may submit a grievance regarding an allegation of sexual abuse." 28 C.F.R. § 115.52(b)(1); National Standards to Prevent, Detect, and Respond to Prison Rape, 77 Fed. Reg. 37106–01 (June 20, 2012) (to be codified at 28 C.F.R. pt. 115); *see also* 28 C.F.R. § 115.5 (defining "Agency" as "the unit of a State, local, corporate, or nonprofit authority, or of the Department of Justice, with direct responsibility for the operation of any facility that confines inmates . . . ."). As to time limits that apply to inmate *lawsuits*, however, § 115.52(b)(4) of the regulations provide: "Nothing in this section shall restrict the agency's ability to defend against an inmate lawsuit on the ground that the applicable statute of limitations has expired." *See also* 77 Fed. Reg. 37106–01 at 37159 ("Importantly, one key time limit will still apply . . . . The statute of limitations provides a backstop against the filing of stale claims . . . ."). By its own terms, the regulation went into effect on August 20, 2012. 28 C.F.R. § 115.52; 77 Fed. Reg. 37106–01 at 37106. Thus, an inmate's *failure to exhaust* can no longer result from an untimely grievance if that grievance involved an allegation of sexual abuse.

**2. MDOC's PREA Grievance Process**

On April 27, 2016, Michigan instituted a two-step PREA grievance process for sexual-abuse claims. At Step I, an inmate must submit a grievance form to the PREA coordinator or inspector at the facility at which the inmate is housed. R. 27-2 (MDOC PREA Grievance Process) (Page ID #334). All PREA grievances are also referred to an "Internal Affairs Division" for investigation. *Id.* (Page ID #335). MDOC requires the PREA coordinator or inspector to "ensure a written response is provided to the prisoner within 60 calendar days of

receipt of the Step I PREA grievance unless an extension [of up to seventy days] has been approved by the Internal Affairs Division in order to conduct an appropriate investigation." *Id.* But if an extension is approved, an inmate must "be informed in writing . . . and provided a date by which a decision will be made." *Id.*; *see also* 28 C.F.R. § 115.52(d)(3) ("The agency may claim an extension of time to respond, of up to 70 days, if the normal time period for response is insufficient to make an appropriate decision. The agency shall notify the inmate in writing of any such extension and provide a date by which a decision will be made.").

Then, an inmate "may only file a Step II administrative appeal to the PREA Administrator if s/he is dissatisfied with the response received at Step I or if s/he did not receive a timely response at Step I." R. 27-2 (MDOC PREA Grievance Process) (Page ID #335). To appeal to Step II:

> [T]he prisoner must request a [Step II form] from the facility PREA coordinator or inspector and send the completed form to the PREA Administrator within 10 calendar days after receiving the initial response. If no response was received, the prisoner shall submit the appeal within 10 calendar days after the date the response was due, including any extension.

*Id.* Accordingly, whether or not the coordinator or inspector complies with MDOC's sixty-day response requirement, an inmate must file a Step II appeal.

Regarding Step II, we further observe that, at oral argument, counsel for the State represented that "the only reason a prisoner would go to Step II on the PREA grievance is that if we did not investigate." Oral Argument at 21:51–22:00; *see also id.* at 22:23–29 ("The only time you [i.e., an inmate] would ask for a Step II response is if you were not being investigated"). First, state counsel's description does not appear anywhere in MDOC's regulations. *See* R. 27-2 (MDOC PREA Grievance Process). Second, we also observe that counsel for the State admitted that Doe 8's and Doe 10's grievances *were* being investigated. *See* Oral Argument at 21:19–23, 22:40–52. This fact, of course, implies that these Does would not need to go to Step II (at least according to state counsel's statements).

Ultimately, under the grievance process, the PREA Administrator must provide a "final agency determination on the merits . . . within 90 calendar days from the original filing of the grievance. Computation of the 90 days does not include the 10 days allowed for the prisoner to

file an administrative appeal." R. 27-2 (MDOC PREA Grievance Process) (Page ID #335). MDOC's regulations state that a "Step II decision constitutes the agency's final determination." *Id.* (Page ID #334).

With that background in mind, we turn to Does 8–10s' individual experiences with this administrative process.

## C. John Does 8–10s' Timelines

### *John Doe 8*

Doe 8 was incarcerated at an adult prison at the age of seventeen and has been housed in various MDOC facilities. R. 1 (Compl. at ¶ 48) (Page ID #16). From the time he was incarcerated until approximately one month after his eighteenth birthday, Doe 8 was housed at the Chippewa Correctional Facility ("URF") where he was raped in the shower by an adult inmate. *Id.* at ¶¶ 49–50 (Page ID #17); R. 19-7 (Nelson Aff. at 3) (Page ID #177) (Doe 8 was born on June 29, 1994, and therefore he turned eighteen on June 29, 2012; he was apparently housed at URF from June 7, 2012 to July 18, 2012).

On May 20, 2016, Doe 8 filed a grievance based on the rape and sexual harassment that he experienced while at URF. R. 27-9 (Page ID #374–75). After that, Doe 8 received from MDOC a memo that stated his complaint would be treated as a PREA grievance. R. 27-11 (Page ID #380); R. 27-5 (Doe 8 Decl. at 2) (Page ID #343). Although the MDOC memo was dated May 26, 2016, *see* R. 27-11 (Page ID #380), the grievance itself was purportedly "[r]eceived at Step I" on June 1, *see* R. 27-9 (Page ID #374). Furthermore, Doe 8 completed a questionnaire related to his grievance. R. 27-16 (Page ID #395–98).

On June 13, Doe 8 received a "response" from the PREA coordinator. R. 27-5 (Doe 8 Decl. at 2) (Page ID #343). The response stated that his "PREA Grievance . . . has been received and reviewed," that he would "be notified of the outcome of the investigation at the conclusion of the investigation," but also that "[a]lthough the investigation is pending, this PREA Grievance is considered responded to and closed." R. 27-3 (Page ID #338). Doe 8 was unsure what the June 13 response meant. R. 27-5 (Doe 8 Decl. at 2) (Page ID #343). In the absence of any

indication from MDOC as to which of the two contradictory statements in that response were true, Doe 8 nonetheless filed a handwritten Step II appeal on June 27, 2016—after he requested a Step II form but received no response.  *Id.* at 2–3 (Page ID #343–44); R. 27-18 (Page ID #405).

Another PREA form, completed by "Sgt. Belanger," stated that "[t]he investigation found INSUFFICIENT EVIDENCE to support that the alleged conduct occurred."  R. 27-13 (Page ID #384).  The form is dated July 18, 2016, but Doe 8 claims that he never received any response other than the May 26 memo and the June 13 "PREA Grievance Response."  R. 27-5 (Doe 8 Decl. at 2–3) (Page ID #343–44).  At oral argument, counsel for the State represented to the court that the July 18 "Investigative Findings and Action" form is neither a Step I nor a Step II document; rather, it is "the termination of" the process.  *See* Oral Argument at 23:27–32; *see also* R. 27-14 (Doe 10's Investigative Findings and Action form).  It not entirely clear, however, whether the Investigative Findings and Action form is the "final agency determination" because, per MDOC's PREA policy, that must "be provided by the PREA Administrator."  R. 27-2 (MDOC PREA Grievance Process) (Page ID #335).  Yet at oral argument, counsel for the state responded that "Sgt. Belanger" "would have been one of the investigators," and counsel did not "think he was the PREA Administrator."  *See* Oral Argument at 23:32–24:00.

### *John Doe 10*

Doe 10 was incarcerated at an adult prison at the age of sixteen and has been housed in various MDOC facilities.  R. 1 (Compl. at ¶ 73) (Page ID #21).  Doe 10 alleges that, while he was under the age of eighteen, he experienced various forms of sexual and physical abuse and harassment and that adult inmates pressured Doe 10 for sex.  *See id.* at ¶¶ 75–77, 81–82 (Page ID #21–22).  For example, when Doe 10 was housed at the Saginaw Correctional Facility ("SRF"), Doe 10 alleges that an adult inmate sexually assaulted him in the shower and that, following this incident, other adult inmates also sexually abused and harassed Doe 10.  *Id.* at ¶ 81–82 (Page ID #22).  Doe 10 was housed at SRF from March 8, 2012 to May 21, 2013, and he turned eighteen-years old on April 25, 2012.  *See* R. 19-7 (Nelson Aff. at 3) (Page ID #177).

On May 25, 2016, Doe 10 filed a grievance based on the sexual abuse and harassment that he experienced at these various MDOC facilities.  R. 27-10 (Page ID #377–78); R. 27-6

(Doe 10 Decl. at 1–2) (Page ID #348–49). On June 8, 2016, Doe 10 received a memo stating that his complaint would be treated as a PREA grievance. R. 27-12 (Page ID #382); R. 27-6 (Doe 10 Decl. at 2) (Page ID #349). After that, Doe 10 received questionnaires about his grievance. The questionnaires are dated July 13 and July 14, 2016, and Doe 10 completed and returned these questionnaires on July 13 and July 15, respectively. *See* R. 27-21 (Page ID #418–21); R. 27-22 (Page ID #423–25). In the first questionnaire, Doe 10 explains that the SRF incident occurred in "April 2012" and also states that he could not "remember exact dates." R. 27-21 (Page ID #418). Doe 10 also stated in the first questionnaire that the sexual harassment that he experienced at Michigan Reformatory ("RMI") occurred between December 2011 and January 2012. *Id.* (Page ID #421).

Doe 10 waited for a response but never received one. R. 27-6 (Doe 10 Decl. at 2) (Page ID #349). Accordingly, Doe 10 requested a grievance appeal form sometime in early July, but Doe 10 claims that he never received any form. *Id.* So Doe 10 used the only form available, a Step I form, to file his appeal on August 1, 2016 (a date that is within ten days after the sixty-day mark of filing his May 25 Step I grievance). *See id.*; R. 27-23 (Page ID #427). In "mid-August," a grievance coordinator apparently returned this attempted appeal to Doe 10 with a note that stated Doe 10 needed to send the form to SRF. R. 27-6 (Doe 10 Decl. at 2) (Page ID #349); R. 27-24 (Page ID #429). On August 22, 2016, Doe 10 mailed the form to SRF. R. 27-6 (Doe 10 Decl. at 3) (Page ID #350).

Furthermore, on August 15, 2016, MDOC wrote a memo that mirrored Doe 8's confusingly-worded form. *See* R. 27-4 (Page ID #340) (Doe 10); R. 27-3 (Page ID #338) (Doe 8). Specifically, Doe 10's memo states that, "Although the investigation is pending, this is your PREA Grievance response." R. 27-4 (Page ID #340). At any rate, it is unclear whether Doe 10 received this memo because he does not claim that he did in his declaration. R. 27-6 (Doe 10 Decl. at 1–3) (Page ID #348–50); *but see* Appellants' Br. at 5 ("JD 10 did not *receive* a response to his initial grievance *for well over two months*, and it too only advised the investigation was pending.") (emphasis added). This lack of clarity, however, is immaterial: Even if Doe 10 received the memo, MDOC's response was late; further, Doe 10 re-submitted his Step II appeal on August 22, within ten days of this "response."

On August 17, 2016, just two days after the memo dated August 15 that stated an investigation was pending, MDOC issued findings related to Doe 10's grievance and determined that there was "NO EVIDENCE to support that the alleged conduct occurred." R. 27-14 (Page ID #386). Doe 10 apparently never received this form. R. 27-6 (Doe 10 Decl. at 1–3) (Page ID #348–50). "Inspector Massick," a PREA inspector or coordinator, R. 27-4 (Page ID #340), completed the form that contained this finding and determination, R. 27-14 (Page ID #386). We note again that MDOC's policy states that a PREA *coordinator* or *inspector* must "ensure a written response is provided to the prisoner within 60 calendar days of receipt of the *Step I* PREA grievance unless an extension has been approved by the Internal Affairs Division in order to conduct an appropriate investigation." R. 27-2 (MDOC PREA Grievance Process) (Page ID #335) (emphasis added). And again, this August 17 form that was signed by an individual who is a PREA inspector is, apparently, neither a Step I nor Step II form, but rather "the termination of" the process. Oral Argument at 23:27–32.

Lastly, the Investigative Findings and Action form resolves a complaint that Warden Tom Winn assaulted Doe 10 on April 1, 2012. R. 27-14 (Page ID #386). Doe 10's grievance, however, states that other, older prisoners perpetrated the assaults and abuse. R. 27-10 (Page ID #377) ("I . . . was physically assaulted by other prisoners, and was threatened and harassed by staff and held in solitary confinement. . . . I experienced sexual harassment by older prisoners . . . ."). Meanwhile, Doe 10 states that Warden Winn (among others) "failed to take adequate precautions to protect [Doe 10] from assaults and abuse that [he] experienced as a result of being a youth in adult prison." *Id.*

### John Doe 9

The issue with Doe 9 is whether his fear of retaliation excuses his failure to file a grievance. It is undisputed that Doe 9 has not filed a PREA grievance. In the prior litigation, *supra* Section I.A., the district court dismissed Doe 9's retaliation excuse because the plaintiffs cited no record evidence to support the argument that the exhaustion requirement should be excused. *Does 1–12*, 2017 WL 993184, at *5.

Doe 9 was incarcerated in September 2011 and has been housed at various MDOC facilities. R. 1 (Compl. at ¶ 59) (Page ID #18). Doe 9 turned eighteen-years old on January 25, 2012, when he was housed at Newberry Correctional Facility ("NCF"). R. 19-7 (Nelson Aff. at 3) (Page ID #177). Prior to that, and while Doe 9 was still seventeen-years old, Doe 9 was housed at URF. R. 1 (Compl. at ¶ 61) (Page ID #19). At URF, Doe 9 alleges that adult inmates sexually harassed, abused, and threatened him. *Id.* This abuse included one adult inmate "regularly grop[ing] and pull[ing] on [Doe 9's] genitals and grab[bing] his buttocks." *Id.*

Doe 9 alleges that he sought the help of MDOC staff and provided a written statement about these incidents. *Id.* at ¶ 62. After that, Doe 9 alleges that he was placed in solitary confinement and then transferred to NCF. *Id.* Moreover, at NCF, adult inmates "exercised control over John Doe 9 and threatened him with physical violence" because Doe 9 attempted to report the URF incidents. *Id.* at ¶ 63. In this case, Doe 9 has also submitted a declaration that refers to other instances of retaliation because of his involvement in the various pieces of litigation related to the former policy of juvenile inmates being housed with adults. *See* R. 27-28 (Doe 9 Decl. at 1–4) (Page ID #442–45). Doe 9 concludes by stating that,

> After the prior threats and harassment I received as a result of my involvement in this litigation and my prior experiences with reporting abuse, I was too fearful to file a grievance in order to exhaust my administrative remedies.
>
> [ ] It is my opinion that if I filed a formal grievance [MDOC staff] would carry out the threats ["to plant a weapon in my cell"] and it would make things worse among staff and prisoners, without any benefit.

*Id.* at 4 (Page ID #445); *see also id.* at 3–4 (Page ID #444–45) (alleged threats by MDOC staff).

Both parties in this case cite depositions taken in a separate piece of litigation (which is also *not* the prior litigation mentioned earlier) that suggest this retaliation occurred. *See generall*y R. 30-8 (Doe 9 Dep. from Separate Litig.) (Page ID #531–42); R. 27-30 (Skip Barnett Dep. from Separate Litig. at 105) (Page ID #451) (stating that "there is no question" that the Alger MDOC facility ("LMF"), where Doe 9 has been housed, has "a culture of retaliation"); *see also, e.g.*, R. 30-8 (Doe 9 Dep. from Separate Litig. at 48–49) (Page ID #539) (Doe 9's cellmate thought it was "f***** up" both that Doe 9 was raped at age seventeen and that Doe 9 reported

the incident); *id.* at 24 (Page ID #535) ("I already got targeted because of this, this whole thing, specifically by my bunkie."). For example, one deposition suggests that, because Doe 9 was involved in various pieces of litigation, MDOC staff read Doe 9's legal mail, destroyed his property, and called him a rape victim over the loudspeaker (thereby indicating to other inmates that Doe 9 reported the abuse by adult inmates to prison staff). R. 30-8 (Doe 9 Dep. from Separate Litig. at 16, 20–22) (Page ID #533–35). Additionally, the Plaintiffs state in their brief that Doe 9 was "falsely accused of contraband possession by MDOC staff." Appellants' Br. at 44 (citing R. 27-29 (Page ID #447) to support this claim); *see also* R. 27-28 (Doe 9 Decl. at 2–4) (Page ID #443–45) (stating that a knife was placed in his cell and that he fears MDOC will plant another weapon in his cell).

## D. District Court Grants Summary Judgment to Defendants

The district court entered summary judgment for the Defendants because the district court concluded that the Plaintiffs failed to exhaust their administrative remedies as required by the PLRA. *Doe 8 v. Snyder*, No. 17-11181, 2018 WL 1035715, at *7 (E.D. Mich. Feb. 23, 2018). The district court determined, in part, that the general grievance process, rather than the PREA process, applied. *Id.* at *4. Finally, the district court failed to address the merits of Doe 9's claim that he should be excused from exhaustion based on the alleged retaliation that he experienced. Instead, the district court again relied on its determination that the two-step PREA process did not apply. *Id.* at *7.

## II. STANDARD OF REVIEW

"We review de novo a district court's grant of summary judgment." *Siggers v. Campbell*, 652 F.3d 681, 691 (6th Cir. 2011) (quoting *Spencer v. Bouchard*, 449 F.3d 721, 727 (6th Cir. 2006)). Summary judgment is proper if, when drawing all inferences in the light most favorable to the non-moving party, the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

The PLRA provides that an inmate may not bring an action related to prison conditions under federal law "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Defendants moved for summary judgment based on the Plaintiffs' failure to

exhaust. Failure to exhaust is an affirmative defense. *Jones v. Bock*, 549 U.S. 199, 216 (2007). We also review de novo a district court's dismissal of an inmate's claim for failure to exhaust. *Surles v. Andison*, 678 F.3d 452, 455 (6th Cir. 2012); *Risher v. Lappin*, 639 F.3d 236, 239 (6th Cir. 2011). Because the Defendants bear the burden of proof on exhaustion, they bear an "initial summary judgment burden [that] is higher in that [they] must show that the record contains evidence satisfying [their] burden of persuasion" and "that no reasonable jury would be free to disbelieve it." *Surles*, 678 F.3d at 455–56 (internal quotations omitted). We further analyze whether an inmate has made "affirmative efforts to comply with the administrative procedures" and "whether those 'efforts to exhaust were sufficient under the circumstances.'" *Risher*, 639 F.3d at 240 (quoting *Napier v. Laurel County*, 636 F.3d 218, 223–24 (6th Cir. 2011)). A district court should grant summary judgment only if a defendant establishes that there is no genuine dispute of material fact that the plaintiff failed to exhaust. *Id.*

### III. THE PREA GRIEVANCE PROCESS APPLIES

The parties dispute which administrative process the Plaintiffs were required to exhaust. The Defendants contend that "[t]he only administrative process available . . . was MDOC's regular three-step grievance process." Appellees' Br. at 21. Under that general process, grievances need "to be submitted within 7 days of an incident," and therefore, the Plaintiffs' grievances would be untimely. *Id.* at 26. But here, the Defendants' treatment of the grievances contradicts their argument.

The Defendants unquestionably treated the Plaintiffs' complaints as PREA grievances.[1] Thus, even if the Defendants were correct that the three-step general process should have applied, "[w]hen prison officials decline to enforce their own procedural requirements and opt to consider otherwise-defaulted claims on the merits, so as a general rule will we." *Reed-Bey v. Pramstaller*, 603 F.3d 322, 325 (6th Cir. 2010); *see also Mattox v. Edelman*, 851 F.3d 583, 591 (6th Cir. 2017) ("[P]rison officials waive any procedural irregularities in a grievance when they nonetheless address the grievance on the merits.") (citing *Reed-Bey*, 603 F.3d at 325). This reasoning applies to this case. The Defendants failed to enforce their own procedural rules under

---

[1]R. 27-11 (Page ID #380); R. 27-3 (Page ID #338); R. 27-13 (Page ID #384); R. 27-12 (Page ID #382); R. 27-4 (Page ID #340); R. 27-14 (Page ID #386).

the three-step grievance process when they channeled the Plaintiffs' grievances through the PREA process and ultimately concluded that Doe 8's and Doe 10's claims lacked evidence. We do not "second guess [a State's] decision to overlook or forgive its own procedural bar." *Reed-Bey*, 603 F.3d at 325. In short, we generally treat inmate complaints in the same way as prison officials have treated them, and here that means PREA applies.[2] Because of the factual and procedural similarities between John Doe 9 and John Does 8 and 10, we think it likely that the grievance John Doe 9 would have filed absent his fear of retaliation would also have been treated as a PREA grievance.

To the extent that the Defendants argue that the Plaintiffs' grievances are not actually about sexual abuse and harassment, *see, e.g.*, Appellees' Br. at 24, that argument is completely baseless. The Plaintiffs' complaint and their grievances clearly allege various incidents of rape and other forms of sexual abuse and harassment. Sexual abuse has a rather capacious definition. *See* 28 C.F.R. § 115.6. The incidents alleged in the Plaintiffs' complaint and grievances plainly meet this definition. *See supra* Section I.C.

Indeed, with these arguments, the Defendants appear to be trying to recast an argument from the prior litigation, *supra* Section I.A., that PREA applied to only federal prisons and not the States. The DOJ refuted that argument in its Statement of Interest in that case, *see* Case No. 2:13-cv-14356, Dkt. 56 (DOJ Statement of Interest at 3–7) (Page ID #768–72), probably because it is completely atextual, *see* 34 U.S.C. § 30309(7); 28 C.F.R. § 115.5. Now the Defendants argue that PREA does not apply to Michigan, at least not at the time of these grievances and in this particular context. For the reasons stated above, these arguments are meritless.

Having determined that the PREA grievance process is the relevant MDOC administrative remedy, we now turn to the question of whether that remedy is "available" under the PLRA.

---

[2]Accordingly, we need not address arguments on retroactivity of the PREA rules.

### IV.  MDOC's PREA GRIEVANCE PROCESS IS UNAVAILABLE

In general, the PLRA's exhaustion requirement is a strict rule, but there are a few exceptions.  "[T]he PLRA contains [a] textual exception to mandatory exhaustion.  Under § 1997e(a), the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Ross*, 136 S. Ct. at 1858.  The Supreme Court explained that this exception "has real content"—specifically, "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'"  *Id.* at 1858–59 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)).  We hold that MDOC's PREA grievance process is, in practice, unavailable, and consequently, Doe 8 and Doe 10 need not exhaust it.

Doe 9's case presents a slightly different unavailability question:  Whether Doe 9's fear of retaliation excuses his failure to file a grievance.  The district court erred when it granted summary judgment to the Defendants as to Doe 9.  On remand, the district court should address the retaliation excuse on the merits.

### A.  John Doe 8 and John Doe 10

In *Ross v. Blake*, the Supreme Court discussed two circumstances in which the PLRA's unavailability exception applies that are relevant here.  First, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use.  In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it."  *Id.* at 1859.  This is a "high[] bar" that applies "when a remedy is . . . essentially 'unknowable'—so that no ordinary prisoner can make sense of what it demands."  *Id.*; *see also Goebert v. Lee County*, 510 F.3d 1312, 1323 (11th Cir. 2007) ("That which is unknown and unknowable is unavailable . . . If we allowed jails and prisons to play hide-and-seek with administrative remedies, they could keep all remedies under wraps until after a lawsuit is filed and then uncover them and proclaim that the remedies were available all along.") (internal citation omitted).  If a remedy fits that bill, then exhaustion is not required.

Next, exhaustion is not required "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Ross*, 136 S. Ct. at 1860; *see also id.* at n.3 (collecting examples). In particular, this exception applies when prison officials "prevent the[] use of otherwise proper procedures," *id.* at 1860, or design a process that can "trip[ ] up all but the most skillful prisoners." *Id.* (quoting *Woodford v. Ngo*, 548 U.S. 81, 102 (2006)). If a remedy is administered or designed in this way, then inmates need not exhaust.

Looking at this record, the State's administration of its PREA grievance process is a classic case of Orwellian doublethink that falls comfortably within the circumstances outlined in *Ross v. Blake*. *See* GEORGE ORWELL, 1984 at 214 (1949) ("*Doublethink* means the power of holding two contradictory beliefs in one's mind simultaneously, and accepting both of them."); *see also id.* at 27 ("WAR IS PEACE," "FREEDOM IS SLAVERY," "IGNORANCE IS STRENGTH"). Examples of such contradictory statements abound in this record, and inmates need not navigate this "labyrinthine world of doublethink" to satisfy the exhaustion requirement. *See* Orwell, *supra*, at 35. These examples show that, in practice, "no ordinary prisoner [could] discern or navigate" the PREA grievance process and that the process was designed "to 'trip[ ] up all but the most skillful prisoners.'" *See Ross*, 136 S. Ct. at 1859–60 (quoting *Woodford*, 548 U.S. at 102).

*First*: MDOC stated that the investigation of a grievance is "pending" and an inmate will "be notified of the outcome . . . at the conclusion of the investigation," while simultaneously stating that the grievance is "responded to and closed." R. 27-3 (Page ID #338). In the Defendants' view, the grievance is both pending and closed. This makes no sense.

*Second*: An inmate proceeds to Step II only if MDOC does not investigate, *see* Oral Argument at 21:51–22:00, 22:23–29, and Doe 8's and Doe 10's grievances *were* being investigated. Before the district court, however, the Defendants stated that part of the reason the Plaintiffs failed to exhaust is because the "Plaintiffs never submitted Step II PREA grievance appeals after receiving their PREA grievance responses . . . ." R. 19 (Defs.' Mot. for Summ. J. at 13) (Page ID #102). MDOC sent Does 8 and 10 initial memos that apparently are Step I

responses,[3] but why would they appeal to Step II given that those responses were timely and that there was nothing to be dissatisfied about because an investigation was pending?[4]  In the Defendants' view, in order to exhaust the inmates must appeal the initial response that stated an investigation was pending, but they need not appeal if their grievance is under investigation. This also makes no sense.

*Third*:  A prison official inaccurately described the PREA process to Doe 10.  MDOC's regulations require an inmate "to appeal the Step I decision . . . to the PREA Administrator in Central Office."  R. 27-2 (MDOC PREA Grievance Process) (Page ID #334).  Doe 10's grievance coordinator, however, returned an attempted appeal and told Doe 10 to send it to SRF—not the Central Office.  R. 27-6 (Doe 10 Decl. at 2) (Page ID #349).  And if the coordinator meant that Doe 10 needed to file the initial grievance at SRF (where the incident occurred), that is inaccurate as well.  *See* R. 27-2 (MDOC PREA Grievance Process) (Page ID #334) ("A prisoner may file a PREA grievance at any time . . . with the facility PREA coordinator or inspector of the institution *at which the prisoner is housed*.") (emphasis added).  Either way, the prison gave Doe 10 the wrong instructions.

*Fourth*:  If an inmate receives no response, the date that a response is due from MDOC, and thus the date that appeal must be filed, may well be unclear.  To illustrate:  MDOC requires a PREA coordinator to respond to a Step I grievance within sixty days of *receiving* the grievance. One might simply assume that the coordinator receives a grievance on the same day that an inmate submits the grievance.  But based on this record, that assumption would be very wrong. Doe 8, for example, filed his grievance on May 20, 2016, but the coordinator did not receive it until June 1, 2016—about twelve days later.  R. 27-9 (Page ID #374).  Doe 10's grievance form is more difficult to decipher.  The "Date Received at Step I" notes a date in June.  R. 27-10 (Page ID #377).  Based on the fact that MDOC sent Doe 10 a memo about his grievance on June 8, *see*

---

[3]*See* Oral Argument at 21:10–23; R. 27-3 (Page ID #338); R. 27-4 (Page ID #340).  We further observe that Doe 8 received an earlier memo from MDOC that, again, was dated prior to his grievance being received at Step I.  *See* R. 27-11 (Page ID #3380) (dated May 26, 2016); R. 27-9 (Page ID #374) (Doe 8's grievance was received at Step I on June 1, 2016).

[4]*See* R. 27-2 (MDOC PREA Grievance Process) (Page ID #335) ("Prisoners may only file a Step II administrative appeal to the PREA Administrator if s/he is dissatisfied with the response received at Step I or if s/he did not receive a timely response at Step I."); Oral Argument at 21:51–22:00, 22:23–29.

R. 27-12 (Page ID #382), it is possible that the coordinator received the grievance on June 4—ten days after Doe 10 filed the grievance. R. 27-10 (Page ID #377). But the exact date is fairly illegible. The point is, if an inmate receives no response, he or she must nonetheless submit an appeal within ten days after the date that a response was due—but the inmate really has no idea when the sixty-day clock begins to run for MDOC, and consequently, the date an appeal must be filed is unclear.

*Fifth*: The Investigative Findings and Action form is a PREA form, yet it is neither a Step I nor Step II document.[5] That form is apparently "the termination of" the investigation into the grievance, but again, it is not a Step I response that can be appealed. *See* R. 27-2 (MDOC PREA Grievance Process) (Page ID #335). Then the Investigative Findings and Action must be a "final" decision—but that is not clear. In the Defendants' view, this form is "the termination" of the PREA process, which per MDOC's policy involves two steps, but this form is neither a Step I nor Step II decision. This compounds the confusion. (At any rate, the prison did not provide Doe 8 or Doe 10 with this form or a Step II appeal form.)

*Sixth*: The core of the Defendants' argument in this case is that the Plaintiffs needed to go through the three-step general grievance process. But they undisputedly investigated and ultimately reached a finding on the Plaintiffs grievances *under the PREA process*. In the Defendants' view, the Plaintiffs needed to exhaust the three-step general grievance process for complaints that do not involve sexual abuse because the Plaintiffs did not truly complain about sexual abuse, *see* Appellees' Br. at 24, but the Defendants made the Plaintiffs go through the PREA process because the Plaintiffs' grievances "alleged sexual abuse/harassment." R. 27-3 (Page ID #338); R. 27-4 (Page ID #340). Given all these inconsistent statements and positions, perhaps even the Defendants themselves cannot understand and navigate their own administrative process.

Clearly, the MDOC PREA grievance process is, in practice, filled with contradictions and machinations, and these contradictions and machinations render the process "incapable of use." *See Ross*, 136 S. Ct. at 1859; *see also Pavey v. Conley*, 663 F.3d 899, 906 (7th Cir. 2011) ("An

---

[5]*See* R. 27-13 (Page ID #384); R. 27-14 (Page ID #386); Oral Argument 23:27–32.

administrative remedy is not 'available,' and therefore need not be exhausted, if prison officials . . . inaccurately describe the steps [an inmate] needs to take to pursue it.") (collecting cases from the Third, Fifth, and Seventh Circuits).  It is not that the prison played "hide-and-seek" with an administrative remedy—because the prison did not per se "hide" a remedy.  *See Ross*, 136 S. Ct. at 1860 n.3 (quoting *Goebert*, 510 F.3d at 1323).  The remedy presented, however, is so internally contradictory and described with such inaccuracy that it is, in every practical sense, "unknowable." *See id.* at 1859 (citing *Goebert*, 510 F.3d at 1323); *see also Pavey*, 664 F.3d at 906.  Having failed to articulate how this process actually works, "the defendants should not benefit from [Doe 8's and Doe 10's] inability to find [their] way." *See Goebert*, 510 F.3d at 1323.

Moreover, the record indicates that the Defendants thwarted the Plaintiffs' affirmative efforts to exhaust.  This, too, renders the administrative process unavailable under *Ross v. Blake*. *See* 136 S. Ct. at 1860.  In cases decided before *Ross v. Blake*, we recognized that although an inmate "must make some affirmative efforts to comply with the administrative procedure[,] [t]he procedure becomes 'unavailable' [when] prison officials have somehow thwarted the inmates attempts at exhaustion." *See Brock v. Kenton County*, 93 F. App'x 793, 798 (6th Cir. 2004) (collecting cases in which the unavailability exception applied); *see also Risher*, 639 F.3d at 240–41 (requiring "affirmative efforts," but concluding that an inmate "was not required to make additional efforts beyond the scope of the Bureau's regulations simply because the Regional Director failed to supply him with a document, something it was obligated to do."); *Rancher v. Franklin County*, 122 F. App'x 240, 241–42 (6th Cir. 2005) (excusing exhaustion when an inmate made numerous requests for medical treatment but received no response and presented evidence that, in practice, the prison refused to accept medical grievances).

Here, prison officials effectively prevented the use of the PREA grievance process, even if that process could be an "otherwise proper procedure[]." *See Ross*, 136 S. Ct. at 1860.  For one, prison officials apparently failed to provide an appeal form to Does 8 and 10. *See* R. 27-5 (Doe 8 Decl. at 2–3) (Page ID #343–44); R. 27-6 (Doe 10 Decl. at 2) (Page ID #349).  Notably, despite officials not providing the requisite forms, the Does still made "affirmative efforts to comply with administrative procedures," *Risher*, 639 F.3d at 240, by filing handwritten Step II

appeals in a letter[6] and by using a Step I form (which was available).[7]   And MDOC issued findings that Doe 8's and Doe 10's claims lacked evidence,[8] but the two inmates never received those findings either.[9]   Based on the lack of response, it appears that the prisons ignored the Does' attempted Step II appeals as well.  As the Supreme Court, our own court, and our sister circuits have recognized, "such interference with an inmate's pursuit of relief renders the administrative process unavailable."  *See Ross*, 136 at 1860 & n.3 (collecting cases); *see also, e.g.*, *Williams v. Corr. Officer Priatno*, 829 F.3d 118 (2d Cir. 2016) (holding that a grievance process was unavailable because it was so confusing that it was incapable of use, where plaintiff alleged that he never received grievance responses and that officers never filed forms); *Nunez v. Duncan*, 591 F.3d 1217, 1226 (9th Cir. 2010) ("Rational inmates cannot be expected to use grievance procedures . . . when they are misled into believing they must respond to a particular document in order to effectively pursue their administrative remedies and that document is then not available."); *Rancher*, 122 F. App'x at 241–42; *Brock*, 93 F. App'x at 798.

In sum, this administrative remedy was not available to Doe 8 or Doe 10, and therefore, the PLRA does not require them to exhaust.

**B.  John Doe 9's Retaliation Excuse**

We have also excused an inmate's failure to exhaust "when the improper actions of prison officials render the administrative remedies functionally unavailable."  *Himmelreich v. Fed. Bureau of Prisons*, 766 F. 3d 576, 577 (6th Cir. 2014), *aff'd sub nom. Simmons v. Himmelreich*, 136 S. Ct. 1843 (2016).  In Doe 9's case, the question is whether prison officials took an adverse action "that would 'deter a person of ordinary firmness' from" continuing with the grievance process.  *See Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999) (en banc).  This requirement "is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment."  *Id.* at

---

[6]R. 27-5 (Doe 8 Decl. at 2–3) (Page ID #343–44).

[7]R. 27-6 (Doe 10 Decl. at 2) (Page ID #349).

[8]R. 27-13 (Page ID #384); R. 27-14 (Page ID #386).

[9]R. 27-5 (Doe 8 Decl. at 3) (Page ID #344); R. 27-6 (Doe 10 Decl. at 3) (Page ID #350).

398. "Thus, unless the claimed retaliatory action is truly 'inconsequential,' the plaintiff's claim should" survive a motion for summary judgment. *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002).

The facts of our prior cases are instructive in determining whether Doe 9 meets this standard. In *Thaddeus-X*, sitting en banc, we noted that the plaintiff's "allegations, if true, certainly meet the standard." 175 F.3d at 398. There, the plaintiff alleged that he experienced harassment, physical threats, and that he was transferred to an area of the prison, with allegedly terrible conditions, that housed mentally disturbed inmates. *Id.* In *Bell*, we held that the plaintiff presented sufficient evidence to satisfy the adverse-action prong. 308 F.3d at 605. The plaintiff's evidence in that case showed that prison officials "twice left the plaintiff's cell in disarray, confiscated his legal papers without returning them, and stole the [plaintiff's] medical diet snacks." *Id.* Finally, in *Himmelreich*, we vacated the district court's grant of summary judgment on the basis of a failure to exhaust because the alleged retaliation, if true, "would render the grievance process functionally unavailable for a person of ordinary firmness." 766 F.3d at 578. The plaintiff there alleged that a prison official threatened to transfer the plaintiff to a higher-security prison or penitentiary where he would be more likely to be attacked and placed the plaintiff in a Special Housing Unit for filing a lawsuit. *Id.* at 577–78.

If Doe 9's allegations are true, then he too meets his burden under this standard. Doe 9 alleges that he was placed in solitary confinement and transferred to another facility after he sought help from MDOC staff and provided a written statement about the sexual abuse that he experienced. *See supra* Section I.C. At NCF, the facility to which he was transferred, Doe 9 experienced further threats from inmates. *Id.* Moreover, Doe 9 alleges that prison officials at LMF read his legal mail, destroyed his personal property, and called him a rape victim over the loudspeaker (thus exposing him to further threats and harassment from inmates who would think that Doe 9 was a "rat" for reporting). *Id.* Unquestionably, Doe 9's claim is not merely "inconsequential." Summary judgment, therefore, was improper.

The Defendants appear to contest Doe 9's allegations that prison officials retaliated against him. *See* Appellees' Br. at 42–44. At the very least, the Defendants fail to establish the absence of a genuine dispute of material fact. As stated, if Doe 9's allegations prove to be true,

then the adverse actions that Doe 9 describes would "deter a person of ordinary firmness" from proceeding through the grievance process.

## V.  CONCLUSION

For these reasons, we **REVERSE** the district court's grant of summary judgment to the Defendants and **REMAND** this case for further proceedings consistent with this opinion.  John Doe 9 has presented enough evidence to withstand summary judgment.  Moreover, as John Doe 8's and John Doe 10's experiences with the administrative process provided by MDOC show, the administrative remedy is unavailable, and therefore, exhaustion is not required.