*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

CHRISTOPHER MILAN KROLL,

      Defendant-Appellant.

FOR PUBLICATION
March 31, 2022
9:00 a.m.

No. 357538
Charlevoix Circuit Court
LC No. 19-022813-FH

Before: REDFORD, P.J., and SAWYER and MURRAY, JJ.

MURRAY, J.

In this interlocutory[1] appeal, the primary issue concerns the admissibility of defendant's videotaped statement made during an interview arising from defendant's report of a sexual assault pursuant to the Prison Rape Elimination Act (PREA), 34 USC 30301 *et seq.*, with the answer to that question resolving whether the trial court erred in denying defendant's motion to dismiss the charge of making a false report of a felony, MCL 750.411a(1)(b). We hold that the statement was admissible, that the trial court did not err in denying defendant's motion to dismiss, and therefore affirm.

## I. BACKGROUND

In July 2019 defendant was a prisoner in a Michigan Department of Corrections (MDOC) facility, serving sentences for first-degree retail fraud and possession of methamphetamine. MDOC transferred defendant on a writ to the Charlevoix County jail on July 23, 2019, for proceedings related to pending criminal charges. After court proceedings on July 23, defendant was placed into a temporary holding cell, and the next morning he was put into a cell with nine other inmates.

---

[1] *People v Kroll*, unpublished order of the Court of Appeals, entered October 11, 2021 (Dkt No. 357538).

On the morning of July 24, 2019, the jail administrator went to the detective's office in the sheriff's department and advised Detective Cody Wheat that there was a PREA complaint about a sexual assault in the jail. Detective Wheat, who was unfamiliar with PREA, treated the investigation as a normal sexual assault complaint, and arranged to interview defendant that same morning. The interview was recorded by Detective Wheat's body camera.[2]

Because defendant was incarcerated, at the start of the interview Detective Wheat read defendant his *Miranda* warnings[3] and, after defendant indicated that he understood his rights, Detective Wheat asked defendant whether he agreed to speak with him. Defendant never expressly agreed to waive his constitutional rights to remain silent or wait for an attorney, but he continued to talk to Detective Wheat, essentially without Detective Wheat asking any questions pertaining to what occurred in his jail cell.[4] Defendant continued his colloquy with Detective Wheat, setting forth his general concerns about jail safety and harassment. After detective Wheat informed defendant that he was there in response to his PREA complaint, the following exchange occurred:

> *A.* Okay. That's what I'm explaining to you.
>
> *Q.* Yep. And then—but at the same time, I mean, if you don't want to speak to me, you know,—
>
> *A.* I think I just did.
>
> *Q.* Right. But at the same time, like, I need—I'm here to try to help you,—
>
> *A.* Yeah.
>
> *Q.* —okay. That's why I'm here. I'm not here to cover stuff up. When we got the report back in my office,—
>
> *A.* Yeah.

---

[2] The interview was played for the jury during defendant's first trial, which resulted in a hung jury. The order on appeal was entered prior to the start of defendant's second trial.

[3] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966). It is important to remember that despite courts routinely referring to "*Miranda* rights," *Miranda* only declared the use of warnings that are "not themselves rights protected by the Constitution but [are] instead measures to ensure that the right against compulsory self-incrimination [is] protected." *Michigan v Tucker*, 417 US 433, 444; 94 S Ct 2357; 41 L Ed2d 182 (1974), quoted in *Oregon v Elstad*, 470 US 298, 305; 105 S Ct 1285; 84 L Ed2d 222 (1985). "Rules designed to safeguard a constitutional right, however, do not extend the scope of the constitutional right itself, just as violations of judicially crafted prophylactic rules do not violate the constitutional rights of any person." *Chavez v Martinez*, 538 US 760, 772; 123 S Ct 1994; 155 L Ed2d 984 (2003). In other words, the right against self-incrimination comes from the constitution, not the Supreme Court.

[4] Detective Wheat testified at trial that if defendant indicated that he did not want to talk to him and that he wanted to speak with a counselor, he would have ended the interview.

*Q*. —that you wanted to speak to somebody reference PREA, I was—I'm up here—

*A*. Yeah.

*Q*. —like ready to go and talk to you, okay?

* * *

*A*. I asked to be put in isolation this morning when they took my mat and stuff for no reason. I mean, they didn't even come and say, "Hey, don't do that. That's one of our rules."

*Q*. Right.

*A*. It was, they rushed in, three people, tied—you know, shackled me, told me to get on my knees, shackled me, one person behind me. I don't know if— there's something that was in the vicinity of my anal region that shouldn't have been there when he shackled me. I feel like—and this is—and whether it was to get a reaction out of me, a jerking motion or anything, but I'm conscience [sic] of this. I'm conscience [sic] of what's going on, so I'm very careful what I say, what I do. I've been on my P's and Q's. You know what I mean?

Detective Wheat eventually summarized to defendant what defendant had told him about what led to the officers coming into his jail cell. Defendant then elaborated to Detective Wheat that when the jail officers "put the restraints on . . . my knees are up against the thing, he spreads my—this leg more and something's in—you know what I'm saying, it's inside my ass crack." Defendant said that he was wearing clothing and that it "felt like something oblong like a finger or—I hate to say it, but a penis or—you know what I mean, it could have been something on his belt. I don't know."

As noted, until this point Detective Wheat had not asked defendant any questions, and only tried to explain the process. However, towards the end of the interview the following exchange took place:

*Q*. How long—when that officer was behind you and they were putting the chains on, you felt that object behind you—

*A*. Uh-huh.

*Q*. —how long do you think that was actually touching you for?

*A*. It wasn't—it was seconds. It wasn't minutes. I mean, it was probably 20 to 30 seconds time.

*Q*. Okay.

*A*. You know. And it was continuous. It was like a—

*Q.* It was just there?

*A.* Yeah, it was just there.

*Q.* Okay.

*A.* And then it backed up—when I got uncomfortable and kind of moved my leg, he pulled my leg out more and it was like deliberately there, you know. It was a—it was almost like a deliberate—you know,—

*Q.* Now, you were kneeling. Now, when you say you were kneeling, were you kneeling on like one of those benches in the cell?

*A.* Yeah. There's a nitch—

*Q.* Okay.

*A.* —probably about this high.

*Q.* Yep.

*A.* So, they told me—you know, which I complied, they said put your knees up against that—

*Q.* Yep.

*A.* —and face the wall.

*Q.* And you said the officer actually took your one leg and actually—

*A.* Yes

*Q.* —pushed it further out?

*A.* Yeah. [Tr I, 22-23.]

Defendant confirmed that this was the only "PREA related incident" and that it was a sexual contact that had occurred.

Immediately after completing the interview, Detective Wheat contacted the jail administrator and requested that he pull the body camera footage and retrieve the jail cell footage of the alleged incident. After watching the three videos that same day, Detective Wheat determined that no contact occurred between defendant and the officers,[5] and in fact none of the officers came anywhere close to defendant's buttocks area. He also did not see any of the officers

---

[5] Detective Wheat also contacted the sheriff and requested written statements from the corrections officers involved and the road deputy who had been in the detective's office.

spread defendant's legs further apart. The information was submitted to the prosecutor the same day, which led to the charge at issue.

A jury trial was held over two days in March and August 2020.[6] The jury viewed the video recording of the interview, heard the voicemail of defendant's PREA report, and listened to testimony from various witnesses. The jury was unable to reach a verdict as to whether defendant had made a false report of a sexual assault, so the trial court declared a mistrial.

The trial court scheduled a retrial on the false report charge. Defendant's new counsel filed a motion to dismiss the charge and a motion to exclude the video of defendant's statement to Detective Wheat. In both motions, defendant asked the court to dismiss the case or, alternatively, to preclude the prosecution from introducing: (1) defendant's recorded statement at trial; (2) any evidence of statements made by defendant for purposes of filing and pursuing his request for a PREA investigation; and (3) any allegations that defendant was reporting a crime at the time of his statements. Defendant supported his motion with the argument that the PREA applies to a county jail, that the interview was made relative to a PREA complaint, and that the statements made during the interview were confidential and could not be used as a basis for the charge. He also asserted that Detective Wheat coerced his statement in violation of the First and Fifth Amendments to the U.S. Constitution by misrepresenting to defendant that the interview was being conducted relative to defendant's PREA report.

The prosecution posited several arguments in response, including that no authority was cited for the proposition that PREA applies to a county jail system, or that prosecuting defendant for making a false report was a violation of his First Amendment rights. The prosecution also argued that defendant was not coerced into making the statements, and that defendant's statements were not confidential because the PREA provides that an inmate can be disciplined for filing a false PREA report.

The trial court denied defendant's motions, articulating from the bench the following:

> The whole confidentiality issue involves protecting the inmate from, you know, retribution within the—within the administrative operation of the prison or the jail, and keeping the allegation, you know, separate and quiet from the target of the investigation so that the—the—the reporter's not harmed. There's nothing about somehow giving, you know, an exemption from admissibility in a criminal prosecution.

> I did not find in any way the argument to be persuasive that the defendant has First Amendment rights that were violated, or the First Amendment would somehow—would—there's no First Amendment right to make a false allegation of rape to a law enforcement officer. So the First Amendment does not apply.

* * *

---

[6] The jury trial began on March 11, 2020, but because of the declared state of emergency due to the Covid-19 virus, trial resumed on August 5, 2020.

[Defendant's] Fifth Amendment rights were not violated in any way that—that was argued in the—the—the motions before the Court. And I finally don't find that the defendant's statements to Detective Wheat were confidential and are therefore inadmissible in this criminal case.

\* \* \*

I find that the defense is mis-applying the administrative procedures of the Prison Rape Elimination Act. And so the—the—the motions on grounds presented are—are denied. . . . . I actually went through and read all these statutes and case law and I . . . found . . . the arguments are taken out of context and the . . . cases don't support the . . . arguments made in the motion and the brief. So the—the motions of the defendant are denied.

## II. ANALYSIS

Defendant preserved his arguments on appeal by raising them in a pretrial motion to suppress his statement. *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). When a motion to suppress evidence involves application of statutory law to undisputed facts, this Court's review is de novo. *People v Tanner*, 496 Mich 199, 206; 853 NW2d 653 (2014); *People v Attebury*, 463 Mich 662, 668; 624 NW2d 912 (2001).[7] "The decision whether to admit evidence is within a trial court's discretion. This Court reverses it only where there has been an abuse of discretion." *People v Katt*, 468 Mich 272, 278; 662 NW2d 12 (2003). A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes. *People v Johnson*, 502 Mich 541, 564; 918 NW2d 676 (2018).

## A. GENERAL PREA STANDARDS

Congress enacted PREA with several purposes in mind, including:

(1) establish a zero-tolerance standard for the incidence of prison rape in prisons in the United States;

(2) make the prevention of prison rape a top priority in each prison system;

(3) develop and implement national standards for the detection, prevention, reduction, and punishment of prison rape;

(4) increase the available data and information on the incidence of prison rape, consequently improving the management and administration of correctional facilities;

---

[7] This standard also applies, of course, to the construction and application of federal statutes. *Johnson v Johnson*, 329 Mich App 100, 118; 940 NW2d 807 (2019).

(5) standardize the definitions used for collecting data on the incidence of prison rape;

(6) increase the accountability of prison officials who fail to detect, prevent, reduce, and punish prison rape;

(7) protect the Eighth Amendment rights[8] of Federal, State, and local prisoners;

(8) increase the efficiency and effectiveness of Federal expenditures through grant programs such as those dealing with health care; mental health care; disease prevention; crime prevention, investigation, and prosecution; prison construction, maintenance, and operation; race relations; poverty; unemployment; and homelessness; and

(9) reduce the costs that prison rape imposes on interstate commerce. [34 USC 30302; see also *Does 8–10 v Snyder*, 945 F3d 951, 955-956 (CA 6, 2019), quoting 34 USC 30302(7).]

Congress found that "[p]rison rape often goes unreported, and inmate victims often receive inadequate treatment for the severe physical and psychological effects of sexual assault—if they receive treatment at all." 34 USC 30301(6). Following the commands of the PREA, in 2012 the United States Attorney General published a final rule adopting national standards for the detection, prevention, reduction, and punishment of prison rape. 34 USC 30307(a)(1); 28 CFR 115.5 *et seq*.

## B. PREA INVESTIGATION STANDARDS

The PREA regulations contain standards to provide "policies to ensure referrals of allegations for investigation," 28 CFR 115.22, with the goal of ensuring that an administrative or criminal investigation is completed for all allegations of sexual abuse and sexual harassment. 28 CFR 115.22(a). Amongst other things, the agency is required to provide employee training for those employees who may have contact with inmates. 28 CFR 115.31(a)(1)–(10).

The PREA regulations contain standards on inmate reporting, including the ability to anonymously report a sexual assault. 28 CFR 115.51 states:

(a) The agency shall provide multiple internal ways for inmates to privately report sexual abuse and sexual harassment, retaliation by other inmates or staff for reporting sexual abuse and sexual harassment, and staff neglect or violation of responsibilities that may have contributed to such incidents.

(b) The agency shall also provide at least one way for inmates to report abuse or harassment to a public or private entity or office that is not part of the agency, and that is able to receive and immediately forward inmate reports of sexual

---

[8] The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." US Const, Am VIII.

abuse and sexual harassment to agency officials, allowing the inmate to remain anonymous upon request. Inmates detained solely for civil immigration purposes shall be provided information on how to contact relevant consular officials and relevant officials at the Department of Homeland Security.

      (c) Staff shall accept reports made verbally, in writing, anonymously, and from third parties and shall promptly document any verbal reports.

      (d) The agency shall provide a method for staff to privately report sexual abuse and sexual harassment of inmates.

Inmates are also to have access to support services, with the communications between the inmate and service provider being as confidential "as possible." 28 CFR 115.53(a) & (b).

Following an inmate report, "[t]he agency shall require all staff to report immediately and according to agency policy any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility, whether or not it is part of the agency; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation." 28 CFR 115.61(a). Importantly, "[a]part from reporting to designated supervisors or officials, staff shall not reveal any information related to a sexual abuse report to anyone other than to the extent necessary, as specified in agency policy, to make treatment, investigation, and other security and management decisions." 28 CFR 115.61(b). "The facility shall report all allegations of sexual abuse and sexual harassment, including third-party and anonymous reports, to the facility's designated investigators." 28 CFR 115.61(e).[9]

Once an investigation into an inmate's sexual abuse allegation is complete, the agency is required to inform the inmate as to whether the allegation has been determined to be "substantiated, unsubstantiated, or unfounded." 28 CFR 115.73(a). Substantiated allegations of conduct that appear to be criminal must be referred for prosecution. 28 CFR 115.71(h). Relevant to defendant's situation, the PREA regulations address ""[d]isciplinary sanctions for inmates," 28 CFR 115.78, providing in part that, "[f]or the purpose of disciplinary action, a report of sexual abuse made in good faith based upon a reasonable belief that the alleged conduct occurred shall not constitute falsely reporting an incident or lying, even if an investigation does not establish evidence sufficient to substantiate the allegation."[10] 28 CFR 115.78(f).

---

[9] The regulations also require that an agency "establish a policy to protect all inmates and staff who report sexual abuse or sexual harassment or cooperate with sexual abuse or sexual harassment investigations from retaliation by other inmates or staff, and shall designate which staff members or departments are charged with monitoring retaliation." 28 CFR 115.67(a).

[10] The regulations also provide that an inmate "shall be subject to disciplinary sanctions pursuant to a formal disciplinary process following an administrative finding that the inmate engaged in inmate-on-inmate sexual abuse or following a criminal finding of guilt for inmate-on-inmate sexual abuse." 28 CFR 115.78(a).

With this general framework in mind, we now turn to defendant's specific PREA arguments.

## C.  WHETHER THE PREA APPLIES TO THE CHARLEVOIX COUNTY JAIL.

In its ruling, the trial court assumed that the PREA applied to a county jail. Defendant continues to argue on appeal that the PREA applies to the county jail because the statutory definition of "prison" in 34 USC 30309(7)(a) includes "any local jail or police lockup."  Citing *Does 8–10*, 945 F3d 951, and 28 CFR 115.5, defendant also contends that Michigan adopted the PREA "for money offered as a grant by the Federal Government."[11]

We hold that the PREA applies to the county jail.  The PREA defines the term "prison" as "any confinement facility of a Federal, State, or local government, whether administered by such government or by a private organization on behalf of such a government," and includes "any local jail or police lockup[.]"  34 USC 30309(7)(A).  Consistent with this congressional definition, the regulations provide that the PREA standards apply to an "agency," which is defined as "the unit of a State, local, corporate, or nonprofit authority, or of the Department of Justice, with direct responsibility for the operation of any facility that confines inmates, detainees, or residents . . ." 28 CFR 115.5.  An "inmate" is "any person incarcerated or detained in a prison or jail."  28 CFR 115.5.  "Jail," in turn, is defined as "a confinement facility of a Federal, State, or local law enforcement agency whose primary purpose is to hold persons pending adjudication of criminal charges, persons committed to confinement after adjudication of criminal charges for sentences of one year or less, or persons adjudicated guilty who are awaiting transfer to a correctional facility." 25 CFR 115.5.

Applying these definitions, it is easy to conclude that the county jail is subject to PREA, a fact the county sheriff acknowledged at trial.  The jail is operated by a local law enforcement agency whose primary purpose is to hold persons pending adjudication of criminal charges, persons committed to confinement after adjudication of criminal charges for sentences of one year or less, or persons adjudicated guilty who are awaiting transfer to a correctional facility.  Defendant was also an inmate as defined by federal rule, as he was incarcerated in a jail while awaiting adjudication of charges.[12]  The PREA applied to the county jail where defendant was temporarily housed.

## D.  CAN DEFENDANT'S PREA STATEMENT BE USED TO SUPPORT A CRIMINAL CHARGE OF MAKING A FALSE REPORT OF A FELONY?

---

[11] The prosecution's brief on appeal does not address the applicability of the PREA to the county jail.

[12] A "detainee" is "any person detained in a lockup, regardless of adjudication status."  28 CFR 115.5.  A "lockup" is "a facility that contains holding cells, cell blocks, or other secure enclosures that are: (1) Under the control of a law enforcement, court, or custodial officer; and (2) Primarily used for the temporary confinement of individuals who have recently been arrested, detained, or are being transferred to or from a court, jail, prison, or other agency."  28 CFR 115.5.  Under these definitions, the PREA standards would also apply to this county jail.

The crux of defendant's case is his argument that his report of a sexual assault and his statement given during the investigation of his report were confidential under the PREA and, therefore, could not be used by the prosecution to support a criminal charge of making a false report of a felony. As the prosecution argues, however, defendant presented no authority that a statement under the PREA is subject to a privilege or immunity that would preclude its introduction into evidence in support of a charge of making a false report of a felony.

Nothing in the PREA directly addresses whether an inmate's PREA statement can be used to support a criminal charge of making a false report of a felony. Defendant's arguments instead focus on the assertion that his report and the resultant investigation were confidential under the PREA.

As a starting point, it is important to recognize that "all relevant evidence is admissible unless the rules of evidence, or the United States or Michigan constitutions, provide otherwise." *Waknin v Chamberlain*, 467 Mich 329, 333; 653 NW2d 176 (2002); MRE 402. Statutes can also address the admissibility of evidence. See, e.g., *People v Watkins*, 491 Mich 450; 818 NW2d 296 (2012)(discussing MCL 768.27a and its limitation on admissible evidence). In the next section we address defendant's argument that the Fifth Amendment precludes the admission of his statements; right now, however, we address the alleged statutory basis to preclude admission of his statements. In doing so, we flatly reject defendant's argument.[13]

A review of the PREA and its regulations demonstrates that the PREA provides for some forms of confidentiality of information during an investigation to protect both the inmate and the alleged perpetrator, including an option for an inmate to anonymously report sexual abuse—which defendant did not do. However, there is nothing in the PREA to suggest that the confidentiality provisions provide an immunity or privilege precluding statements made by an inmate who makes a false allegation of sexual abuse during an investigation. Absent an explicit provision barring the use in court of all or some statements made by a prisoner during a PREA investigation, such statements cannot be deemed inadmissible as a matter of law.

Moreover, by providing, for the purpose of disciplinary action, that "a report of sexual abuse made in good faith based upon a reasonable belief that the alleged conduct occurred shall not constitute falsely reporting an incident or lying, even if an investigation does not establish evidence sufficient to substantiate the allegation," see 28 CFR 115.78(f), the PREA regulations anticipate that disciplinary action may occur if an inmate falsely reports an incident. The PREA does not protect from disciplinary action inmates who report sexual abuse and whose report is deemed false. The PREA standards clearly anticipate disciplinary sanctions against an inmate who makes a false allegation of sexual abuse against a staff member of a facility covered by PREA. Likewise, there is nothing in the PREA to suggest that the availability of disciplinary sanctions

_____

[13] Defendant's references to the administrative remedy of a grievance and to a "First Amendment right to file nonfrivolous grievances against prison officials" are misplaced as there is no evidence that defendant submitted a grievance under 28 CFR 115.52. Although defendant reported an incident of sexual assault under PREA and his allegation was immediately investigated, there is no evidence of a grievance being filed.

following an administrative investigation precludes the agency from reporting the false allegation of sexual abuse to the prosecutor, that false claims of sexual assault may not be prosecuted, or that false claims of sexual assault are privileged or otherwise protected from admission into evidence.[14] Defendant's contention that his statement is inadmissible is simply without merit.

## E.  INVOLUNTARY STATEMENT

In a cursory fashion, defendant challenges the admissibility of his statements to Detective Wheat on the basis that it was involuntarily given.  Although there is nothing in the record to suggest that Detective Wheat had reason to believe that defendant had committed a crime or that he was lying about the sexual assault, Detective Wheat gave defendant *Miranda* warnings because he was incarcerated.

Defendant's one-page argument contains general principles of law, but does not apply the facts of his case to the law and offers cursory analysis at best.[15]  He announces that he is "aware that failure to give a meaningful *Miranda* warning does not violate the United States Constitution, Fifth Amendment," and cites *United States v Patane*, 542 US 630, 631; 124 S Ct 2620; 159 L Ed 2d 667 (2004), but then asserts that "*Palane* [sic] also opined that an insufficient *Miranda* coupled with deception can violate the Fifth Amendment."  He does not otherwise discuss *Patane* or apply it to the controlling facts.

Nonetheless, because defendant was given *Miranda* warnings, *Patane* is immediately distinguishable.  Additionally, defendant's underlying premise—that he was entitled to *Miranda* warnings in the first place—is simply baseless.  The fact that he was in jail on another matter does not in and of itself require that he be provided with *Miranda* warnings before being spoken with by an officer, and nor do any of the other relevant criteria garner support for his argument.  After all, defendant had requested the investigation, he was not under suspicion when interviewed, when he made his initial report—he did not choose the anonymous option of reporting available and was otherwise treated appropriately given the setting.  See *People v Cortez* (*On Remand*), 299 Mich App 679, 695-699; 832 NW2d 1 (2013), citing *Howes v Fields*, 565 US 499, 510-514; 132 S Ct 1181; 182 L Ed2d 17 (2012).  And, even if *Miranda* applied, defendant does not explain how the statements were involuntary, and the record evidence indicates that defendant continued to talk to

---

[14] To the extent that defendant's arguments are based on the county jail's alleged failure to follow PREA standards and violations of PREA training standards, nothing in the statute indicates an intent to give specific rights to prisoners.  In the context of prisoners who have sued for failure to comply with the PREA's requirements, courts have held that no private cause of action under PREA exists and violations of PREA cannot be adjudicated in court.  See, e.g., *Fisher v Fed Bureau of Prisons*, 484 F Supp 3d 521, 537-538 (ND OH, 2020) and *McCloud v Prack*, 55 F Supp 3d 478, 482 n 2 (WD NY, 2014).

[15] "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority."  *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998).  Therefore, defendant has abandoned this issue by failing to adequately brief it.

Detective Wheat after being informed that he was a detective and after being given *Miranda* warnings.

Affirmed.

/s/ Christopher M. Murray
/s/ James Robert Redford
/s/ David H. Sawyer