RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0232p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

TOBY LAMB, II,

                  *Plaintiff-Appellant*,

    *v.*

BRANT KENDRICK, SHANE CAREY, JUSTIN REECE, BRITTANY MAXWELL, JUSTIN CROWDER, and SYDNEY HENSLEY, Correctional Officers,

                  *Defendants-Appellees*.

No. 21-3390

─────────────

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:20-cv-00265—Susan J. Dlott, District Judge.

Argued:  December 8, 2021

Decided and Filed:  October 26, 2022

Before:  CLAY, DONALD, and NALBANDIAN, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:**  Jacqueline Greene, FRIEDMAN, GILBERT + GERHARDSTEIN, Cincinnati, Ohio, for Appellant.  Lori H. Duckworth, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees.  **ON BRIEF:**  Jacqueline Greene, FRIEDMAN, GILBERT + GERHARDSTEIN, Cincinnati, Ohio, Sarah Gelsomino, FRIEDMAN, GILBERT + GERHARDSTEIN, Cleveland, Ohio, for Appellant.  Lori H. Duckworth, Thomas E. Madden, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees.

     DONALD, J., delivered the opinion of the court in which CLAY, J., joined. NALBANDIAN, J. (pp. 16–22), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

BERNICE BOUIE DONALD, Circuit Judge.  Inmate Toby Lamb II alleges that several correctional officers at the Warren Correctional Institution in Lebanon, Ohio ("WCI") brutally beat and pepper sprayed him while he was handcuffed, immediately placed him in solitary confinement, and prevented him from accessing the requisite grievance forms to report the incident properly.  When Lamb sought judicial intervention by bringing this excessive force action under 42 U.S.C. § 1983, defendants promptly responded with a pre-discovery motion for summary judgment accusing Lamb of failing to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a).  Although we agree that Lamb did not exhaust his administrative remedies properly, we nevertheless reverse the district court's judgment dismissing this case and remand for further proceedings because there remain material disputes of fact about whether prison officials rendered those administrative remedies unavailable.

I.

On April 6, 2018, Lamb was involved in a physical altercation with a nonparty correctional officer at WCI.  Lamb alleges that officers Justin Reece, Justin Crowder, Shane Carey, Britany Maxwell, and Sydney Hensley, and Lieutenant Brant Kendrick (collectively, "defendants") retaliated against him later that day by beating him and deploying pepper spray against him while he was handcuffed outside the presence of surveillance cameras.  The beating caused Lamb's eyes to swell shut, and he suffered several other serious temporary and permanent injuries.  Later that night, Lamb was transferred from WCI to the Lebanon Correctional Institution ("LeCI"), where he was placed in restrictive housing comparable to solitary confinement.

When Lamb first arrived at WCI in the spring of 2017, he received orientation training and written materials about Ohio's inmate grievance procedures.  On April 9, 2018, Lamb

initiated these procedures at LeCI by filing the following internal informal complaint (also known as an "ICR"):

> WCI shift supervisor lied on 4/6/18 stating that I refused my "use of force" statement. The nurse treating me at that time could attest to that. My hands were cuffed behind my back and I couldn't even see after officers kicked me in the eye and maced me on the way to the infirmary.

The "WCI shift supervisor" allegedly referred to Lieutenant Kendrick, who submitted an Inmate Use of Force Statement shortly after the April 6 incident indicating that Lamb refused to provide a written statement and instead orally "stated 'I can't write y'all seen what happened.'" On April 17, 2018, WCI Inspector Casey Barr responded to Lamb's informal complaint with a computer entry on the prison's internal JPay Securus System, stating "[y]ou will be able to give your statement during the use of force investigation. I will make sure that your statement is obtained." Lamb asserts that he did not receive this response until March 2020 because he did not have access to the JPay system while in restrictive housing.

Lamb also alleges that he filed a second informal complaint in April 2018, "explain[ing] that force was [applied] against [him] for no reason" and that correctional officers destroyed his property in retaliation. Defendants contend that there is no record of Lamb filing a second informal complaint, which may explain why Lamb never received an associated response.

Having been at LeCI "for some time" and receiving no response to his informal complaints, Lamb alleges that he began asking correctional officers at LeCI for the requisite forms to escalate his grievance, but they repeatedly told him that the prison did not have any. One of those staff members, Inspector Lora Austin, also allegedly told him "that it would be a waste of time" to file an appeal because the appeal deadline had passed. Lamb asserts in his affidavit that because he lacked access to the JPay system or the necessary grievance forms, he did not know how to proceed with his grievance properly and relied exclusively (to his detriment) on prison staff members for assistance. There is no further evidence in the record about how many times he asked for these forms or the dates of his requests.

In November 2018, Lamb was transferred from LeCI to the Southern Ohio Correctional Facility ("SOCF"). There, Lamb allegedly sent an appeal letter directly to the Chief Inspector of

the Ohio Department of Rehabilitation and Correction ("ODRC") at his Ohio address, describing the April 6, 2018 incident and his grievance. Again, defendants claim that there is no copy or record of this letter, and Lamb alleges that he never received a response.

Last, Lamb submitted evidence of a third informal complaint that he allegedly sent on November 29, 2018, to the inspector of institutional services at SOCF, Linnea Mahlman, stating as follows:

> I was beat in handcuffs at WCI and had most of my property destroyed. I wrote ICR's and never received a response. Would you let me know what's going on? Thank you.

Inspector Mahlman asserted in a sworn affidavit that he never received this correspondence.

On April 4, 2020, Lamb brought his grievance to federal court by filing this § 1983 action in the Southern District of Ohio, alleging that all defendants used excessive force against him, and that Lieutenant Kendrick, in his supervisory role, was deliberately indifferent to his employees' conduct.[1] Before the parties conducted discovery or had a meaningful opportunity to develop the factual record, defendants filed a motion for summary judgment, arguing that Lamb failed to satisfy the PLRA's requirement that he exhaust his available administrative remedies before filing suit. *See* 42 U.S.C. § 1997e(a). In support of their motion, defendants submitted a declaration from ODRC Assistant Chief Inspector Antonio Lee, who asserted, in pertinent part, that:

> I have reviewed the entire grievance file of inmate Toby Lamb, II, A734-060. On April 9, 2018, Inmate Lamb submitted an informal complaint resolution (ICR) concerning the "WCI shift supervisor lied on 4/6/18 stating that I refused my 'use of force' statement" regarding the reported use of force occurring on April 6, 2018. The WCI Institutional Inspector, Cynthia Hill, and then her replacement, Casey Barr responded to Inmate Lamb's grievance via the JPay system on April 17, 2018. Inmate Lamb did not file any other informal complaints, grievances or appeals concerning this April 6, 2018 reported use of force.

In their reply, defendants submitted two additional declarations, one from the correctional grievance officer at WCI, Isaac Bullock, and one from Inspector Mahlman. Bullock explained

---

[1]Lamb initially filed state law claims against defendants for negligence and willful, wanton, and reckless conduct, but later voluntarily dismissed those claims from this suit.

that "[c]ontrary to Lamb's assertions, ODRC's grievance process was available to all inmates, at all institutions, in the normal course of business, without delay." Inspector Mahlman further asserted that "[t]here does not appear to be a notice of grievance or an appeal to the Chief Inspector regarding" Lamb's April 9, 2018 informal complaint. Lamb submitted a competing affidavit describing his version of events.

The magistrate judge eventually issued a Report and Recommendation ("R&R") recommending that the district court grant defendants' motion for summary judgment. The magistrate judge concluded that Lamb's April 9, 2018 informal complaint was improper because it did not provide "physical descriptions" of the unnamed officers, and it was undisputed that Lamb failed to comply with the second and third steps of the applicable grievance procedures. The magistrate judge also determined that Lamb's "vague assertions" in his affidavit were insufficient to establish a genuine issue of fact as to whether prison officials rendered his administrative remedies effectively unavailable. Accordingly, the magistrate judge held that "defendants have carried their burden to show that [Lamb] did not exhaust his administrative remedies for his claim based on defendants' alleged use of force on April 6, 2018."

The district court adopted the magistrate judge's R&R over Lamb's objections and dismissed this case without prejudice. This timely appeal followed.

II.

This Court reviews *de novo* a district court's dismissal of a prisoner's civil rights claim for failure to exhaust administrative remedies under the PLRA. *Risher v. Lappin*, 639 F.3d 236, 239 (6th Cir. 2011). This Court also reviews *de novo* a district court's grant of summary judgment. *Siggers v. Campbell*, 652 F.3d 681, 691 (6th Cir. 2011). Summary judgment is proper where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "In considering a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party" but may not weigh the evidence or make credibility determinations. *Troche v. Crabtree*, 814 F.3d 795, 798 (6th Cir. 2016) (citation omitted). And because an inmate's failure to exhaust his administrative remedies is an affirmative defense (not a jurisdictional

requirement) that the defendants have the burden to plead and prove by a preponderance of the evidence, "[a] district court should grant summary judgment only if a defendant establishes that there is no genuine dispute of material fact that the plaintiff failed to exhaust." *Does 8-10 v. Snyder*, 945 F.3d 951, 961 (6th Cir. 2019) (citation omitted); *see also Jones v. Bock*, 549 U.S. 199, 216 (2007) (noting "that inmates are not required to specially plead or demonstrate exhaustion in their complaints").

Congress enacted the PLRA in 1996 to "reduce the quantity and improve the quality of prisoner suits" that were flooding federal district courts nationwide and to reduce the need for federal courts to intervene in prison management. *See Porter v. Nussle*, 534 U.S. 516, 524 (2002); *Freeman v. Francis*, 196 F.3d 641, 644 (6th Cir. 1999). To help achieve these objectives, the PLRA requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This mandatory exhaustion requirement acts as a gatekeeper and is intended "to allow prison officials 'a fair opportunity' to address grievances on the merits, to correct prison errors that can and should be corrected and to create an administrative record for those disputes that eventually end up in court." *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010) (citing *Woodford v. Ngo*, 548 U.S. 81, 94-95 (2006)). Moreover, the term "prison conditions" in § 1997e(a) is broad and includes claims of excessive force. *Freeman*, 196 F.3d at 644.

The PLRA does not provide a uniform federal exhaustion standard; rather, the inmate's correctional institution defines the applicable procedural rules that the inmate must follow to exhaust his administrative remedies. *Jones*, 549 U.S. at 218. Thus, to comply with the PLRA's exhaustion requirement, an inmate must take "advantage of each step the prison holds out for resolving the claim internally and by following the 'critical procedural rules' of the prison's grievance process to permit prison officials to review and, if necessary, correct the grievance 'on the merits' in the first instance." *Reed-Bey*, 603 F.3d at 324 (citing *Woodford*, 548 U.S. at 90, 95); *Risher*, 639 F.3d at 240.

Although the PLRA's exhaustion requirement is strictly construed, the statute "contains its own, textual exception to mandatory exhaustion" that applies when remedies are not

"available." *Ross v. Blake*, 578 U.S. 632, 642 (2016). That is, an inmate must only exhaust available remedies, not unavailable ones. *Id.* (citing 42 U.S.C. § 1997e(a)). The Supreme Court has identified three situations in which an administrative procedure is unavailable to prisoners and is therefore not subject to the exhaustion requirement: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it" because it is "so opaque" or "so confusing"; and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643-44.

Even if an inmate has evidence to show that an administrative procedure was unavailable, he is not automatically absolved from the PLRA's exhaustion requirement because this Circuit requires inmates to make "affirmative efforts to comply with the administrative procedures before analyzing whether the facility rendered these remedies unavailable." *Lee v. Willey*, 789 F.3d 673, 677 (6th Cir. 2015) (quoting *Napier v. Laurel Cnty.*, 636 F.3d 218, 223 (6th Cir. 2011)). "When a prisoner makes affirmative efforts to comply but does not succeed, we analyze whether those efforts to exhaust were sufficient under the circumstances." *Id.* (quoting *Risher*, 639 F.3d at 240) (internal quotation marks omitted).

III.

The parties agree that Lamb needed to follow Ohio's three-step "inmate grievance procedure" to exhaust his administrative remedies properly under the PLRA. *See* Ohio Admin. Code 5120-9-31(J). During the period between the April 6, 2018 incident and when Lamb filed his federal lawsuit on April 4, 2020, there were three different versions of these procedures in effect, and another version—the current version—went into effect on March 21, 2021. For our purposes, there is no meaningful difference between these four versions, and we will cite to the current version of the Ohio Administrative Code in our analysis for ease of reference.

Under step one, the inmate must, within fourteen calendar days of the incident, file with an appropriate staff member an informal complaint that is "specific as to dates, times, places,

physical descriptions of any unidentified personnel and the actions of said personnel giving rise to the complaint." *Id.*; Ohio Admin. Code 5120-9-31(J)(1). Once the appropriate staff member receives the informal complaint, he or she shall then provide a written response within seven calendar days that "reflect[s] an understanding of the inmate's complaint, [is] responsive to the issue, cite[s] any relevant departmental or institutional rules or polices and specif[ies] the action taken, if any."**2** Ohio Admin. Code 5120-9-31(J)(1). However, if the staff member does not provide a timely response, "the informal complaint step is automatically waived[,] and the inmate may proceed to step two." *Id.*

Second, "[i]f the inmate is dissatisfied with the informal complaint response, or the informal complaint process has been waived, the inmate may file a notification of grievance with the inspector of institutional services," which must be filed "by the inmate no later than fourteen calendar days from the date of the informal complaint response or waiver of the informal complaint step." Ohio Admin. Code 5120-9-31(J)(2). Then, within fourteen calendar days of receiving the notification of grievance, "[t]he inspector of institutional services shall provide a written response to the grievance" that "summarize[s] the inmate's complaint, describe[s] what steps were taken to investigate the complaint and the inspector of institutional service's findings and decision." *Id.* "If a disposition has not been rendered after a total of twenty-eight days from the receipt of the grievance, the complaint will be deemed unresolved and the inmate may proceed to step three of the process." *Id.*

Third, "[i]f the inmate is dissatisfied with the disposition of grievance, the inmate may file an appeal with the office of the chief inspector." Ohio Admin. Code 5120-9-31(J)(3). "The appeal must . . . be filed to the office of the chief inspector within fourteen calendar days of the date of the disposition of grievance." *Id.*

---

**2**Step one of the Ohio Administrative Code in effect when Lamb filed his first informal complaint provided: "[I]f the inmate has not received a written response from the staff member within a reasonable time, the inmate *should* immediately contact the inspector of institutional services either in writing or during regular open office hours." Ohio Admin. Code 5120-9-31(K)(1) (2008) (emphasis added). The word "should" in this pre-April 5, 2019 version cannot mean "shall," because the word "shall" is also used in that section and "we must give effect to all the words to avoid an interpretation which would render words superfluous or redundant." *Walker v. Bain*, 257 F.3d 660, 667 (6th Cir. 2001). Given that the term "should" ordinarily means to "suggest[] or recommend[] a course of action," rather than to "describe[] a course of action that is mandatory," *United States v. Maria*, 186 F.3d 65, 70 (2d Cir. 1999), we do not find that the previous version of the statute imposed any relevant mandatory duties on Lamb that we have not described above.

Here, there is no dispute that Lamb failed to exhaust his administrative remedies properly under Ohio's three-step grievance process. Regardless of whether Lamb filed a proper informal complaint under step one (which is disputed and will be discussed below), he did not comply with step two because he never filed a notification of grievance with the inspector of institutional services. *See* Ohio Admin. Code 5120-9-31(J)(2). And even assuming, as Lamb alleges, that he did not receive a timely response to any informal complaint or that the prison's response was deficient, that merely meant that Lamb could proceed to step two. Ohio Admin. Code 5120-9-31(J)(1), (2). By never filing the required notification of grievance, Lamb did not complete "all steps" in the grievance process to satisfy the PLRA's exhaustion requirement. *Woodford*, 548 U.S. at 90; *see also Napier*, 636 F.3d at 226 ("The PLRA's exhaustion requirement is a strict one.").

Our analysis does not end there, however, because Lamb argues in the alternative that he should be excused from the PLRA's exhaustion requirement because his administrative remedies were unavailable. Given that the district court dismissed this case on summary judgment before the parties had a meaningful opportunity to conduct discovery, we must therefore examine the limited evidence before us, including Lamb's sworn affidavit, to determine whether there is at least a genuine issue of material fact that his efforts to comply with Ohio's grievance process were sufficient under the circumstances. *Napier*, 636 F.3d at 224 (noting that "the only way to determine if the process was available, or futile, was to try"). If so, we may then analyze whether those remedies were in fact available to Lamb.

Before continuing with the merits of this appeal, we take a slight detour to address defendants' argument that we should adopt the burden-shifting approach that several sister circuits have used when considering whether an inmate has exhausted his administrative remedies. For example, the Second Circuit holds that "defendants bear the initial burden of establishing, by pointing to 'legally sufficient source[s]' such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute," after which the burden shifts to the plaintiff to "demonstrate that other factors—for example, threats from correction officers—rendered a nominally available procedure unavailable as a matter of fact." *Hubbs v. Suffolk Cnty. Sheriff's Dept.*, 788 F.3d 54, 59 (2d Cir. 2015) (citations omitted).

Other circuits have adopted nearly identical approaches, although they sometimes apply different tests for how plaintiffs can satisfy their burden. *See Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018); *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014); *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011); *Geter v. Baldwin State Prison*, 974 F.3d 1348, 1356 (11th Cir. 2020).

The Sixth Circuit has never adopted a burden-shifting approach for the affirmative defense of PLRA exhaustion, holding instead that "if the plaintiff contends that he was prevented from exhausting his remedies," the defendant must "present evidence showing that the plaintiff's ability to exhaust was not hindered." *Surles v. Andison*, 678 F.3d 452, 457 n.10 (6th Cir. 2012). There are good reasons for this rule. As one magistrate judge in our Circuit aptly noted: "While proving a negative certainly gives pause, it is important to remember the relative positions of the parties in these cases." *Lawson v. LMDC*, No. 3:16-CV-00728-GNS-RSE, 2019 WL 8953354, at *5 (W.D. Ky. Oct. 10, 2019). On one side, we may have a prisoner who, like Lamb, is confined in restrictive settings without even "rudimentary resources" to investigate and explain to the court how prison officials may have rendered his administrative remedies unavailable. *Id.* (citing *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002) (applying this reasoning to the issue of whether PLRA exhaustion is an affirmative defense or a pleading requirement)).[3] On the other side, we have prison officials who "are likely to have greater legal expertise and . . . superior access to prison administrative records in comparison to prisoners," as well as access to attorneys who can "readily provide the court with clear, typed explanations, including photocopies of relevant administrative regulations." *Kertes*, 285 F.3d at 295 (citation omitted). At the end of the day, someone must carry the burden, and "it appears that it is considerably easier for a prison administrator to show a failure to exhaust than it is for a prisoner to demonstrate exhaustion." *Id.* We also find comfort that we are not the sole outlier on this issue, as the Seventh Circuit similarly holds that "[f]ailure to exhaust is an affirmative defense, so the defendants bear the burden of proof and cannot shift it to require [the plaintiff] to show that administrative remedies were unavailable." *Gooch v. Young*, 24 F.4th 624, 627 (7th Cir. 2022) (citation omitted); *see*

---

[3]The Third Circuit later adopted a burden-shifting approach without explanation and without recognizing the stark imbalance of resources and information between prisoner-plaintiffs and prison-official-defendants. *See Rinaldi*, 904 F.3d at 268 (citing *Tuckel*, 660 F.3d at 1253-54).

*also Davis v. Mason*, 881 F.3d 982, 985 (7th Cir. 2018) (holding that "[i]t was not [plaintiff's] burden to establish that the grievance process was unavailable").

With this framework in mind, we turn to whether Lamb made sufficient affirmative efforts to comply with step one of Ohio's grievance process, which requires inmates to file an informal complaint that is "specific as to dates, times, places, physical descriptions of any unidentified personnel and the actions of said personnel giving rise to the complaint." Ohio Admin. Code 5120-9-31(J). Lamb argues that his April 9, 2018 informal complaint satisfied these requirements because it referenced the "WCI shift supervisor" and provided the date of the incident (April 6, 2018), the location ("on the way to the infirmary"), and described an attack by multiple officers. Defendants respond that the complaint was deficient as to the claims in this § 1983 case because it did not grieve the alleged inappropriate use of force, reference any of defendants' names, or allege that Lieutenant Kendrick committed any misconduct in his supervisory role, and instead focused exclusively on the waiver of a statement. The district court—by adopting the magistrate judge's R&R—agreed with defendants that Lamb's informal complaint failed at step one because it did not provide physical descriptions of any unidentified officers.

True, Lamb's April 9, 2018 informal complaint did not provide specific physical descriptions of his then-unknown attackers and therefore did not properly comply with step one of the grievance process. But in faulting Lamb for not describing what those unknown officers looked like, the district court apparently turned a blind eye to the alleged circumstances surrounding the attack. Lamb's informal complaint stated that he had been "kicked . . . in the eye and maced" by multiple officers and "couldn't even see" following the incident. He also submitted pictures of his injuries, substantiating his claim that the beating was severe and caused his eyes to swell shut. Viewing this evidence in the light most favorable to Lamb, as we are required to do on summary judgment, we may infer that he was physically unable to see the unknown officers who attacked him. We further find that it would be unreasonable under these circumstances to require Lamb to provide physical descriptions of unknown prison staff members he could not see. *See Hernandez v. Hernandez*, 2015 WL 2374262, at *5-*6 (E.D. Cal. May 18, 2015), *report and recommendation adopted*, 2015 WL 3545630 (E.D. Cal. June 4,

2015); *Abney v. Younker*, No. 1:13-cv-1418, 2018 WL 398323, at *4 (M.D. Pa. Jan. 12, 2018). Based on the record before us, we conclude that Lamb's affirmative efforts to file an informal complaint that complied with step one of Ohio's grievance procedure were reasonable, but prison officials rendered that process unavailable to him by severely damaging his vision.

There is also a genuine dispute of fact regarding whether Lamb corrected any deficiencies in his first informal complaint by filing a second one within fourteen days of the incident. Lamb asserts in his affidavit that he filed a second complaint "about the use of force in approx. 4/2018" explaining that "force was [used] against me for no reason[.]" The district court and magistrate judge appeared to discount Lamb's evidence about this second informal complaint because it was uncorroborated and because WCI grievance officer Bullock stated in his declaration that he reviewed Lamb's grievance file and only found the April 9, 2018 complaint. This was improper because a party may rely on an affidavit to establish a genuine dispute of fact, so long as the affidavit is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Indeed, a prisoner's sworn affidavit, standing alone, may create a genuine dispute of material fact that forecloses summary judgment on exhaustion even if the record lacks corroborating evidence. *Moran v. Al Basit LLC*, 788 F.3d 201, 206 (6th Cir. 2015). And where, as here, the evidence consists of one party's affidavit against another's, there is no rule of procedure that allows federal courts to disregard the plaintiff's testimony simply because it is self-serving. *Pierce v. Rowland*, 2021 WL 3929549, at *4-*5 (6th Cir. Sept. 2, 2021) (citing *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010)). Thus, given that Lamb submitted his affidavit at the summary judgment stage, his uncorroborated affidavit is sufficient to create a genuine dispute of material fact regarding whether he filed a second informal complaint that complied with step one.[4] *See id.*; *Moran*, 788 F.3d at 206.

---

[4]We need not consider the third informal complaint that Lamb allegedly sent on November 29, 2018, because it is undisputed that he did not file it within fourteen days of the April 6, 2018 incident as required by step one, and it is well settled that "[a] prisoner must adhere to any time limitations that are part of the institutional grievance policy." *Surles*, 678 F.3d at 455 (citation omitted).

We next move to the thornier issue of whether Lamb's efforts to comply with step two were sufficient under the circumstances and, if so, whether prison officials made the process unavailable to him by preventing him from filing a notification of grievance. As mentioned above, Lamb did not properly exhaust his administrative remedies under step two because he never filed a notification of grievance with the inspector of institutional services. He nonetheless argues that he should be excused from the exhaustion requirement because prison officials allegedly thwarted his attempts to file a notification of grievance by: (1) transferring him to highly restrictive housing at a new institution; (2) repeatedly refusing to provide him necessary grievance forms; and (3) misleading him into believing that his claim was futile. Each of these allegations warrants further discussion.

According to Lamb's affidavit, the ODRC transferred him to LeCI immediately after the April 6, 2018 incident and placed him in restrictive housing, where he did not have access to the prison's JPay system or forms for filing a proper notification of grievance or appeal. He instead relied solely on correctional officers at LeCI to provide him the necessary grievance forms. Grievance officer Bullock agreed that inmates in restrictive housing may access exhaustion forms by request and that prison officials should provide forms to inmates without delay. However, despite the consensus about how the grievance process should ideally work, Lamb's affidavit states that correctional officers denied his repeated requests for grievance forms and told him that the prison did not have any available. Lamb even identified Inspector Austin by name and asserts that she misleadingly advised him that it would be a waste of time to appeal his informal complaint because the deadline had passed.[5] We agree with many of our sister circuits that administrative remedies are not "available" if prison employees refuse to provide inmates with necessary grievance forms when requested. *See Dale v. Lappin*, 376 F.3d 652, 656 (7th Cir. 2004); *Mitchell v. Horn*, 318 F.3d 523, 529 (3d Cir. 2003); *Miller v. Norris*, 247 F.3d 736, 738, 740 (8th Cir. 2001). Therefore, if the assertions in Lamb's sworn affidavit are true, they would

---

[5]Defendants argue that Inspector Austin's statements, even if true, had no bearing on Lamb's failure to exhaust because the deadline to escalate his informal complaint to a notification of grievance had likely expired when he spoke with her. *See Surles*, 678 F.3d at 455. However, in making this argument, defendants omit that "[t]he inspector of institutional services may also waive the timeframe for the filing of the notification of grievance, for good cause." Ohio Admin. Code 5120-9-31(J)(2). It thus cannot be said with absolute certainty that Lamb missed the filing deadline when he spoke with Inspector Austin, and that is a dispute of fact we cannot resolve here.

at least create a dispute of fact regarding whether prison officials at LeCI failed to follow their own procedures and thwarted his affirmative efforts to comply with step two. *See Ross*, 578 U.S. at 644; *see also Risher*, 639 F.3d at 241 ("When pro se inmates are required to follow agency procedures to the letter in order to preserve their federal claims, we see no reason to exempt the agency from similar compliance with its own rules.").

Again, the magistrate judge and district court improperly discredited Lamb's affidavit and testimony about these issues. They concluded that Lamb's "vague assertions" about prison officials denying his requested forms and Inspector Austin's misrepresentations, "without more, are insufficient to create a genuine issue of fact on whether [Lamb] was thwarted from timely pursuing his administrative remedies." We disagree because, unlike in the litany of unpublished cases cited in the R&R, Lamb's affidavit alleged specific facts about why he relied solely on LeCI correctional officers for step two grievance forms and how those officers, including Inspector Austin, repeatedly prevented him from exhausting his remedies by refusing to provide those forms upon request. Lamb's factual allegations do not become "vague assertions" merely because he is the plaintiff and does not have corroborating evidence. *See Pierce*, 2021 WL 3929549, at *4-*5.

We must also keep in mind that *defendants* moved for summary judgment on the issue of exhaustion before discovery, and they bore the burden of production and persuasion on that affirmative defense. *Jones*, 549 U.S. at 216; *Surles*, 678 F.3d at 458. They have not met that burden here because they have not presented any evidence, let alone any irrefutable evidence, demonstrating that prison officials did in fact provide Lamb with grievance forms when he requested them. Defendants' sole evidence in the form of competing declarations—none of which came from Inspector Austin or another officer that spoke to Lamb about his grievance— describes the grievance process in general and how it should work, but those declarations do not demonstrate the absence of a factual dispute regarding whether proper grievance forms were made available to Lamb "on certain occasions or as to particular claims." *Surles*, 678 F.3d at 457-58. As a result, we do not find that defendants presented significant probative evidence "so powerful that no reasonable jury would be free to disbelieve" Lamb's allegations that his administrative remedies were unavailable. *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036,

1056 (6th Cir. 2001) (citation omitted). Therefore, defendants were not entitled to summary judgment on the issue of exhaustion.

Given our conclusion above, it is irrelevant whether Lamb made affirmative efforts to file an appeal with the chief inspector because "inmates are foreclosed from proceeding to step three until they receive a response to their step two grievance." *Troche*, 814 F.3d at 800-01. Obviously, Lamb never received a response to a notification of grievance because he never filed one, and we previously held that it "does not make sense" to require inmates to appeal the disposition of their notification of grievance before that disposition is rendered. *Id.* at 801. If prison officials made step two unavailable to Lamb by preventing him from filing a notification of grievance, then they likewise made step three unavailable. On the other hand, if step two was in fact available, then Lamb would have failed to exhaust his administrative remedies for failing to file a notification of grievance, not for failing to file an appeal. The district court will be in a better position to address those issues on remand after the parties complete discovery.

As a final note, we acknowledge that defendants may ultimately prevail on the exhaustion issue later in the case or at trial (where they will have the benefit of discovery and a more substantial factual record) by showing that the entire grievance process was fully available to Lamb. But taking the allegations in Lamb's affidavit as true and drawing all reasonable inferences in his favor, a jury could conclude that Lamb's efforts to comply with steps one and two were sufficient under the circumstances and that prison officials rendered those steps unavailable. *See Troche*, 814 F.3d at 800. That is enough to survive summary judgment at this stage of the case.

IV.

For the foregoing reasons, the district court's order granting defendants' motion for summary judgment is **REVERSED**, and this case is **REMANDED** for further proceedings consistent with this opinion.

————————

**DISSENT**

————————

NALBANDIAN, Circuit Judge, dissenting.   The Ohio Department of Rehabilitation and Correction (ODRC) has a three-step grievance process.  Our precedent says that even if Lamb was ultimately prevented from exhausting his administrative remedies, he had to show that he made some affirmative efforts to comply with ODRC's grievance process that were sufficient under the circumstances.  In my view, Lamb's affirmative efforts weren't.  So I would affirm the district court's judgment.

**I.**

The majority and I agree on the basic framework for an exhaustion defense in a Prison Litigation Reform Act (PLRA) case.  To recap, the rules of the road are: (1) A prisoner can generally only bring a PLRA action in federal court after exhausting his administrative remedies; (2) Exhaustion means that a prisoner has followed the state's grievance process before filing in state court; (3) When a prisoner fails to exhaust, the defendants can raise that failure as an affirmative defense under the PLRA; (4) If the defendants raise an exhaustion affirmative defense, it's their burden to show that a prisoner failed to exhaust; and (5)  At times, we excuse exhaustion, like when the defendants were the ones who prevented the plaintiff from exhausting his administrative remedies.  *See Surles v. Andison*, 678 F.3d 452, 455–57 & n.10 (6th Cir. 2012) (citations omitted).  So far, so good.

The tricky part of this analysis, especially at summary judgment, relates to step (4)— namely, understanding the defendant's burden on a failure-to-exhaust affirmative defense on summary judgment.  We've said that on summary judgment the defendants "must show that the record contains evidence satisfying their burden of persuasion [on the exhaustion defense] and that no reasonable jury would be free to disbelieve it." *Does 8–10 v. Snyder*, 945 F.3d 951, 961 (6th Cir. 2019) (altered) (internal citation and quotation marks omitted).  And that makes sense. If we're going to cut the plaintiff's case off at the summary judgment stage based on an affirmative defense, it stands to reason that the defendants must show not only that "no genuine

dispute" of material fact exists but also that they *would win* on an exhaustion defense at trial. *Id.* (quoting Fed. R. Civ. P. 56(a)).

Our circuit has a burden-shifting analysis that goes like this. Once the defendants have raised an affirmative defense of failure to exhaust, we analyze whether the plaintiff has "contend[ed] that he was prevented from exhausting his [administrative] remedies . . . ." *Surles*, 678 F.3d at 457 n.10. If a plaintiff has "allege[d]" that the defendants somehow blocked his access to administrative remedies, *id.*, we then require a plaintiff to produce *evidence* that he made "affirmative efforts to comply with the administrative procedures" nonetheless, *Lee v. Willey*, 789 F.3d 673, 676–77 (6th Cir. 2015) (quoting *Napier v. Laurel County*, 636 F.3d 218, 223 (6th Cir. 2011)); *Napier*, 636 F.3d at 224 ("We are not requiring that a prisoner utilize every conceivable channel to grieve their case, but even when a policy is vague, a prisoner must do what *is* required by the grievance policy.").

If the plaintiff contended that administrative remedies were unavailable *and* produced evidence that he made affirmative efforts to comply with the grievance process, the burden shifts back to the defendants, who must "show that [they] did not interfere with a plaintiff's ability to exhaust his administrative remedies." *Surles*, 678 F.3d at 457 n.10. If the defendant meets that burden, the plaintiff then must "rebut" that evidence with evidence that those administrative remedies were in fact unavailable to him. *Napier*, 636 F.3d at 226. Then, it's the district court's call as to whether the defendants proved their exhaustion affirmative defense by the preponderance of the evidence. *See Lee*, 789 F.3d at 677.

The majority says that we have not adopted a burden-shifting approach to the exhaustion affirmative defense under the PLRA. (Majority Op. at 10.) But I don't think that's right. After the defendants provide evidence that the plaintiff has failed to exhaust, the plaintiff must provide evidence that he took "affirmative efforts" to comply with administrative procedures, even if he didn't use them. *Lee*, 789 F.3d at 677. And that seems like a burden shift to me.

## II.

Although we differ in our characterization of the exhaustion framework under the PLRA, the majority and I both agree that it requires that the plaintiff show that he took affirmative

efforts to comply with the grievance process. (*See* Majority Op. at 11–13, 15.) I disagree with the majority that Lamb's affirmative efforts were sufficient here.

We look at a state's grievance procedure to determine whether a plaintiff took sufficient affirmative steps under the circumstances. If Lamb establishes affirmative efforts through his presentation of the evidence, we look at the defendants' evidence to see if there is a genuine dispute of material fact on whether the affirmative acts were sufficient.

The ODRC grievance process has three steps. *See* Ohio Admin. Code 5120-9-31(J)(1–3). First, the inmate must submit an informal complaint to a supervisor within fourteen days of the event that gave rise to the complaint. *Id.* 5120-9-31(J)(1). Prison staff then must issue a response in seven days or alternatively waive that response. *Id.* If the state does not respond after the seven days, the Inspector of Institutional Services may grant an additional four calendar days for response. *Id.* So added up, if eleven days have passed from the date of the filing of the informal complaint, the state is considered to have waived a response. *Id.* Second, if the inmate doesn't agree with the prison staff's response or the state has waived, he can file a formal complaint with the Inspector of Institutional Services. *Id.* 5120-9-31(J)(2). An inmate must file this formal complaint within fourteen days of receiving the resolution of (or no response to) his informal complaint. *Id.* The Inspector of Institutional Services has fourteen days from receipt of the formal complaint to respond or waives a response after twenty-eight days. *Id.* Then, under the third step of the grievance process, if the plaintiff is still dissatisfied, he can file an appeal to the ODRC Office of the Chief Inspector within fourteen days of the resolution or waiver of the formal complaint. *Id.* 5120-9-31(J)(3). And the ODRC Office of the Chief Inspector must respond within thirty days of receiving that appeal. *Id.*

Here, Lamb exerted no affirmative efforts on step two of the grievance process. Lamb explains that he submitted his first informal complaint on April 9, 2018, and a second informal complaint on an unspecified date, also in April 2018. Because the incident occurred on April 6, 2018, Lamb could have theoretically filed his second (or any) informal complaint all the way up to April 20, 2018, fourteen days after the incident occurred. Then, the prison staff would have theoretically had eleven days to waive a response, creating a May 1, 2018 waiver deadline.

And, in turn, Lamb would have had fourteen days from the waiver deadline to file a formal complaint. That would have given Lamb a May 15, 2018 deadline to file his formal complaint.

But the record reflects that in the over four years since the incident giving rise to this lawsuit occurred Lamb never filed a formal complaint under step two of the ODRC grievance process. In other words, he took *no* affirmative steps on this front. He gives several reasons why that's so. He says he was transferred to restrictive housing at Lebanon Correctional Institution the day after the incident occurred and he didn't have access to the online grievance portal or ODRC policy manual there. He says that after he had been at Lebanon Correctional Institution "for some time and received no response from ODRC" he "began asking correctional officers for grievance forms so that" he could "appeal ODRC's lack of response." (R. 19-2, Lamb Affidavit, at 3.) He says that one of the prison officials "told [him] that it would be a waste of time [to appeal] because the time had already passed for [him] to submit an appeal, and because the prison did not have any forms." (*Id.* at 4.) He says that no correctional staff gave him the grievance forms when he asked because they said the forms were unavailable. These contentions all go to the ultimate question of whether Lamb was prevented from exhausting his administrative remedies. But they don't solve the affirmative efforts problem that he never says anywhere in his affidavit that he ever tried to file a formal complaint in compliance with step two.

So we're left with the fact that he filed an informal complaint. He didn't receive a response. He didn't file a formal complaint. So he didn't make affirmative efforts to follow ODRC grievance procedure. *See* Ohio Admin. Code 5120-9-31(J)(2).

Further, his affidavit never specifies the months and years when he asked for any forms from the officers to establish that he had tried to comply with the mandatory grievance timeline. His allegations are vague and not time-specific, spanning the course of over two years, not at all tied to the filing of a formal complaint.

The statements in his affidavit don't show that he did his part in complying with the policy. He never showed that he tried to follow step two but admits that he received the grievance policy when he arrived at the prison in 2017. That policy explained the grievance

process deadlines. "[A] prisoner must do what *is* required by the grievance policy" even when a prisoner is not able to "utilize every conceivable channel to grieve their case." *Napier*, 636 F.3d at 224. And Lamb's affidavit didn't establish that he did what was required.

Even when he asked for forms from different prison officials, it was so that he could appeal his case, the third step of the grievance process, not so that he could file a formal complaint under step two. In my view, the filing of a single (or maybe two) informal complaints is not the kind of affirmative effort that is sufficient under a three-step grievance process with a tight timeline.

Lamb may have in the end been prevented from complying with step two, but he could have shown that he tried to comply by asking for forms within the relevant time window under the grievance procedure. *See Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011) (explaining that when an inmate does "not attempt to bypass the administrative grievance process" and instead "affirmatively endeavor[s] to comply with it," a plaintiff has shown affirmative efforts). In this case, Lamb didn't.

## III.

As a final matter, I'd like to address a point the majority touched on. Our circuit has departed from other circuits in how we approach the burden-shifting analysis for exhaustion. And I think that was an error on our part. All the circuits agree, as they must per the Supreme Court, that the defendants have the ultimate burden of persuasion to establish an exhaustion affirmative defense under the PLRA at the summary judgment phase. *See Jones v. Bock*, 549 U.S. 199, 212 (2007). Where the circuits disagree is when the burden of production shifts to the plaintiff within that analysis.

I've catalogued our approach above. But there's another way, the path several other circuits take. Under their view, the initial burden is on the defendants to establish that a grievance process exists that would have been generally available to people in the plaintiff's position. *See Mojias v. Johnson*, 351 F.3d 606, 609–10 (2d Cir. 2003). If the defendants establish this, then the burden of production shifts to the plaintiff to establish by evidence that, although a grievance process was available on paper, it still was unavailable in practice because

of other factors, like harassment or threats or abuse from officers. *See Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc). And from this evidence, and any other evidence provided by the defendants, other circuits hold, the district court must determine whether the defendants met their ultimate burden of proof. *See, e.g.*, *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011).

There is a key distinction between that approach and our current one. We put the entire burden on the *defendants* to prove that they did not hinder an inmate's exhaustion of administrative remedies, albeit after the plaintiff shows his affirmative efforts to take advantage of the remedies. Other circuits put a burden of production on the *plaintiff* to show that the defendants prevented him from exhausting his administrative remedies. In my view, our approach is problematic because we ultimately require defendants to prove the negative: that they did not hinder an inmate's ability use the grievance process. *See Piedmont & Arlington Life Ins. v. Ewing*, 92 U.S. 377, 378 (1875) ("While it may be easy enough to prove the affirmative . . . it is next to impossible to prove the negative."); *Boykin v. Fam. Dollar Stores of Mich., LLC*, 3 F.4th 832, 842 (6th Cir. 2021) ("The summary judgment standard does not require [a party] to prove a negative." (quotation omitted)).

The text of the PLRA and common sense support my view that the other circuits got this one right. If we instead required a plaintiff to provide evidence at summary judgment that he was prevented from complying with the grievance process, he could point to concrete actions of the defendants that led to his inability to exhaust. The plaintiff in that situation would only have to prove a positive—some external circumstance made administrative remedies unavailable— that is statutorily baked into the PLRA. *See Ross v. Blake*, 578 U.S. 632, 642 (2016) (explaining that the only "textual exception to mandatory exhaustion" is when administrative remedies are "unavailable").

In enacting the PLRA, Congress "invigorated" the requirement that a plaintiff "must exhaust available remedies" under 42 U.S.C. § 1997e(a). *Id.* at 641–42 (quotation omitted). We expect plaintiffs to exhaust, and when they don't, Congress said they typically don't have a remedy in federal court. So it stands to reason that if they failed to exhaust administrative remedies, they'd be the ones who would need to explain why the remedies were unavailable.

And the Supreme Court seems to have implicitly approved of that approach. *See Ross*, 578 U.S. at 648 (remanding for consideration of the *plaintiff's* argument that remedies were unavailable to him after defendants established that plaintiff had not exhausted).[1]

As a beneficial side effect, adopting the other circuits' approach would eliminate our odd, initial inquiry into whether a plaintiff has made "affirmative efforts" to comply with the grievance process that are "sufficient under the circumstances . . . ." *Napier*, 636 F.3d at 223–24 (quotation omitted). We've never really explained what that standard means. It's opaque at least. And it doesn't contemplate that a plaintiff may be unable to take affirmative efforts *at all* because of threats, intimidation, or fear of other officers.

**IV.**

For these reasons, I would adopt the approach of other circuits in the burden-shifting analysis if this were a matter of first impression. But, because I don't write on a blank slate, I acknowledge that our circuit has already set the standard we must apply in this case. In doing so, I don't think Lamb's affirmative efforts were sufficient under the circumstances. So I respectfully dissent.

---

[1]And, in general, burden shifting for affirmative defenses usually requires the plaintiff to prove something responsive to the defendants' initial burden. *See, e.g.*, *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 156–57 (1970) (burden shifting in the summary judgment context adopting that approach); *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014) (burden shifting in the qualified immunity context adopting that approach); *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001) (burden shifting in the statute of limitations context adopting that approach).